[No. B130777. Second Dist., Div. Six. Nov. 30, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
BRYAN TONEY, Defendant and Appellant.

## COUNSEL

Joseph B. de Illy, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, and John R. Gorey, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**COFFEE, J.**—Appellant challenges the sufficiency of the evidence supporting his felony child abuse conviction. We affirm.

### FACTS AND PROCEDURAL HISTORY

Sheriff's Deputy Michael Thompson was on duty at 10:30 p.m. in East Lancaster. He saw appellant driving a white Toyota in front of him with expired tags. After running a check, he discovered its registration had been expired for over a year. Thompson made a lawful traffic stop in which appellant consented to a search that yielded a small quantity of marijuana. He was arrested.

A search of appellant's car revealed a cellophane wrapper in the ash tray which contained a small amount of methamphetamine (0.223 grams) and a Ziploc baggie on the driver's seat that yielded a small amount of cocaine base (0.0942 grams). Thirty-six boxes of pseudoephedrine cold medicine and three bottles of iodine tablets were found in the trunk.

A search of appellant's residence pursuant to a warrant revealed a "fume trap," in the living room: a five-gallon plastic bucket containing cat litter and tubing, designed to absorb deadly fumes released during the manufacture of methamphetamine.[1] In the dining room was a cardboard box, which held a container of muriatic acid, plastic filters of isopropyl alcohol, isotone, rubber gloves, tubing and hydrogen peroxide. A second box contained various liquids, including solvents and a mixture of hydrochloric acid and red phosphorous. In the kitchen was a jug containing a bilayered liquid that showed traces of methamphetamine and hydroxide. On the floor was a three-gallon pail of a caustic chemical that could melt the skin on contact.

In the garage were solvents, Coleman fuel, and a camp stove with white residue. There was also a fenced-off area in the backyard built up with trash. It was filled with empty containers of solvent, actifed and lye, as well as a discarded respirator.

---

[1]Approximately three months before his arrest, appellant had purchased one pound of red phosphorous, which is used in the manufacture of methamphetamine. This is a two-stage process. Muriatic acid is combined with red phosphorous and iodine to make hydriatic acid for the initial reaction, which is then used to convert pseudoephedrine to methamphetamine.

To set up the kind of laboratory that appellant had at his house would take approximately five minutes. To cook and process the methamphetamine would take from eight to twelve hours.

In the living room were several tables with a child's paperwork. There was also a child's bedroom with toys and drawings that looked "lived in." Appellant was married to Judith W., who had a six-year-old son from a previous relationship, Morgan. Morgan lived with his grandmother, but visited Judith on weekends, and had been there the weekend prior to the search.

A jury convicted appellant of the following six counts: 1) possession of ephedrine with intent to manufacture methamphetamine (Health & Saf. Code, § 11383, subd. (c)(1)); 2) possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)); 3) possession of cocaine (Health & Saf. Code, § 11350, subd. (a); 4) possession of marijuana while driving (Veh. Code, § 23222, subd. (b); 5) manufacturing of methamphetamine (Health & Saf. Code, § 11379.6, subd. (a); and 6) felony child abuse (Pen. Code, § 273a, subd. (a).)[2] The court sentenced appellant to five years in state prison.

## DISCUSSION

### *Felony Child Abuse or Endangerment*

We determine whether a rational trier of fact could have found appellant guilty beyond a reasonable doubt of felony child abuse. (*People* v. *McKelvey* (1991) 230 Cal.App.3d 399, 404 [281 Cal.Rptr. 359].) "Any person who, under circumstances or conditions likely to produce great bodily harm or death, . . . having the care or custody of any child, willfully causes or permits the person or health of that . . . child to be placed in a situation where his . . . person or health is endangered, shall be punished by imprisonment . . . ." (§ 273a, subd. (a).)

Appellant first argues there was no direct evidence that he voluntarily assumed the role of caregiver of his stepson, or that they resided together. He claims he was not Morgan's biological father, and the fact that Morgan had a bedroom in the house and visited occasionally does not support the inference that Morgan was in his care or custody.

No special meaning attaches to this language "beyond the plain meaning of the terms themselves. The terms 'care or custody' do not imply a familial

---

[2]All further statutory references are to the Penal Code unless otherwise indicated.

relationship but only a willingness to assume duties correspondent to the role of a caregiver." (*People* v. *Cochran* (1998) 62 Cal.App.4th 826, 832 [73 Cal.Rptr.2d 257] [a mother and her child had moved into the defendant's home where the defendant later caused the child's death].)

Here, appellant had married Judith, who moved into his home. He also invited Morgan into his home, gave him a room of his own and allowed him to use an area in the living room where the child's paperwork was found. This evidence is sufficient to demonstrate appellant's willingness to assume the care or custody of Morgan.

The second requirement under the statute is that the prohibited conduct be both willful and " ' "likely to produce great bodily harm or death." ' " (*People* v. *Sargent* (1999) 19 Cal.4th 1206, 1216 [81 Cal.Rptr.2d 835, 970 P.2d 409]; *People* v. *Odom* (1991) 226 Cal.App.3d 1028, 1032 [277 Cal.Rptr. 265].) The act need not, however, result in great bodily injury. (*Sargent, supra,* at p. 1216; *Odam, supra,* at p. 1033.)

■ Cases involving "indirect abuse" require a showing of criminal negligence. (*People* v. *Sargent, supra,* 19 Cal.4th at p. 1218.) This is defined as " 'reckless, gross or culpable departure from the ordinary standard of due care; . . . conduct . . . [which is] incompatible with a proper regard for human life.' " (*People* v. *Odom, supra,* 226 Cal.App.3d at p. 1032 [child endangerment existed where home had exposed wiring, was scattered with dog feces, pipes in kitchen sink were eaten away by chemicals; spoiled food was scattered throughout kitchen; no food was in the cupboards; and there was a hole in the roof. The home also contained loaded weapons and caustic chemicals for the manufacture of methamphetamine.].)

The *Odom* court concluded that it would have been impossible to protect the children residing in the house from their natural curiosity concerning "wires, guns, dogs and chemicals," or the home's general lack of safety precautions. It also stated that even if methamphetamine was not manufactured at the home, but at another location, the storing of the chemicals in the home created a danger. (*People* v. *Odom, supra,* 226 Cal.App.3d at p. 1035.)

■ Public policy supports the protection of children against risks they cannot anticipate. The felony child abuse statute "was enacted in order to protect the members of a vulnerable class from abusive situations in which serious injury or death is likely to occur." (*People* v. *Heitzman* (1994) 9 Cal.4th 189, 203-204 [37 Cal.Rptr.2d 236, 886 P.2d 1229] [application of the elder abuse statute, which was patterned after the felony child abuse statute].)

Appellant's home contained extremely dangerous chemicals in the living room, dining room, kitchen and garage. Many were on the floor. In the backyard was a pile of debris indicating the use of these chemicals. Not only were the chemicals dangerous in themselves, they were also highly flammable. Any reasonable person would understand the risks posed to a child in such a setting. Appellant willfully exposed Morgan to danger that was likely to produce great bodily harm. The elements of the statute were met. We need not reach the issue of whether methamphetamine was manufactured in the house or at another site.

The judgment is affirmed.

Gilbert, P. J., and Yegan, J., concurred.

A petition for a rehearing was denied December 22, 1999, and appellant's petition for review by the Supreme Court was denied March 15, 2000. Mosk, J., was of the opinion that the petition should be granted.