[No. D051221. Fourth Dist., Div. One. July 21, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JOE REYES PEREZ, Defendant and Appellant.

**COUNSEL**

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steve Oetting and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

I.

INTRODUCTION

Defendant Joe Reyes Perez appeals from a judgment of conviction for possession of heroin, cruelty to a child by endangering the health of the child, and unauthorized possession of hypodermic needles or syringes. Perez contends that there is insufficient evidence to support his conviction for endangering the health of a child. Perez further contends that the trial court erred in failing to give Perez's proposed amplifying instruction concerning the meaning of "care or custody" as it relates to the endangerment charge.

We conclude that there is substantial evidence to support the jury's finding of guilt on the charge of endangering the health of a child. We further conclude that the trial court did not err in refusing to instruct the jury with the amplifying instruction Perez requested because the proposed instruction is an incomplete statement of the law, and the jury had already been properly instructed. We therefore affirm the judgment of conviction.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*

1. *The prosecution case*

At just after 2:00 p.m. on February 23, 2007, Chula Vista Police Department detectives from the Narcotics Enforcement Team served a search

warrant at a residence located on Montgomery Street. When officers arrived, Perez and two other men were standing in front of the house. Perez ran inside and attempted to close and lock the front door behind him. Sergeant Randy Smith managed to detain Perez just inside the residence. Other officers detained the two other men outside.

Detectives began to search the home, yard, and outbuildings on the property. Inside the front entryway, detectives found six bindles of heroin that weighed approximately 3.4 grams. Officers found the bindles in a plant that was hanging from the ceiling. Officers found four more bindles of heroin, which weighed approximately 2 grams, and a syringe filled with liquid inside an unlocked drawer of a chess set that was on an end table in the entry room to the residence. Officers found another syringe filled with liquid on top of a short end table inside the same entry room. A Department of Motor Vehicles (DMV) renewal form and a bill, both in Perez's name, were next to the syringe. Detectives also found several bindles that contained heroin residue on top of a four-foot-tall dresser in Perez's bedroom.

Perez was arrested and was advised of his *Miranda*[1] rights. He admitted that all of the drugs that police found in the home belonged to him. Perez said that he had purchased approximately 10 to 11 bindles of heroin in preparation for a trip to Oregon. He admitted that he had sold drugs in the past, but he denied having sold drugs recently.

Perez's sister, Henrietta Delgado, owns the Montgomery Street residence and lives there with her daughter, Maria Viloria; Viloria's 15-year-old son; and Perez. Viloria's four-year-old daughter, S.F., spends a couple of nights per month at the residence as well. S.F. lives with her father in Tijuana the rest of the time. When she is at Delgado's home, S.F. sleeps in her mother's room. S.F. identified Perez as "Daddy Joe" and testified that he is at her grandmother's house all of the time. S.F. eats meals with Perez and visits Perez's pet parrot, Molly.[2]

When asked how much time S.F. spends with Perez, Viloria replied, "I don't know—when she was at my mom's, with my mom on her days off, I'm not there; but she probably saw him come in and come out. I'm not sure." Viloria testified that Perez was never "required to babysit" and that he was "never the caretaker of S.[F.] in the house." When Viloria is at work, Delgado takes care of S.F. Viloria has never seen Perez use drugs or appear to be under the influence of drugs. She also has never seen drugs in the house.

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

[2] Sergeant Smith noted that Perez has a birdcage in his bedroom.

Viloria takes hormones and uses syringes for her injections. She has educated S.F. "regarding the safety surrounding the use of syringes."

Delgado testified that Perez has been living with her since October 2003. Perez had not had a job in the year prior to trial. Delgado was not sure what Perez does during the day, but noted that he helps around the house, and that he makes some money collecting recyclable items and taking them to a recycling center. Delgado said that she takes care of S.F. when S.F. is at the Montgomery Street residence, and that Perez is not the "person who's supposed to take care of" S.F. Delgado works from 11:00 p.m. to 7:00 a.m., Friday through Tuesday each week. She sleeps during the day. Officers executed the warrant at Delgado's home on a Friday.

2. *The defense case*

Perez did not testify. He presented the testimony of a substance abuse counselor to refute the prosecution's argument that the amount of heroin Perez possessed was consistent with an intent to sell.

B. *Procedural Background*

Perez was charged in an information with one count of possession of heroin for sale (Health & Saf. Code, § 11351) (count 1); one count of cruelty to a child by endangering the health of the child (Pen. Code, § 273a, subd. (b)) (count 2); and one count of unauthorized possession of hypodermic needles or syringes (Bus. & Prof. Code, § 4140) (count 3). Count 1 was a felony, and counts 2 and 3 were misdemeanors. The information further alleged that Perez had previously been convicted of violating Health and Safety Code section 11352 within the meaning of Health and Safety Code section 11370.2, subdivision (a), and Penal Code section 1203.07, subdivision (a)(3).

Perez pled not guilty, and the case was tried to a jury. After the prosecution's case-in-chief, Perez moved for dismissal of count 2 on the ground that there was insufficient evidence to support a finding of guilt. The trial court denied the motion. Perez renewed the motion after all of the evidence in the case had been presented. After hearing additional argument from the parties, the trial court again denied the motion.

On May 16, 2007, the jury found Perez guilty of the lesser included offense of possession of heroin on count 1. The jury convicted Perez on

counts 2 and 3 as charged. On June 14 the trial court sentenced Perez to a total prison term of two years eight months.

Perez filed a timely notice of appeal on July 3, 2007.

III.

DISCUSSION

Perez asserts that his conviction on count 2, the child endangerment count, must be reversed on two grounds. Perez first contends that there was insufficient evidence to support the jury's verdict that he violated Penal Code[3] section 273a, subdivision (b). Specifically, he claims that there is insufficient evidence that he ever had "care or custody" of S.F., and further contends that there is insufficient evidence that he willfully caused the child's "person or health to be injured." Alternatively, Perez claims that the trial court erred when it declined to give a jury instruction that defense counsel proposed regarding the meaning of "care or custody." According to Perez, the court should have clarified for the jury that it had to find that he was acting in the role of a caretaker in order to find him guilty of child endangerment. We reject both contentions.

A. *There Is Substantial Evidence to Support the Jury's Verdict on Count 2*

Perez was convicted under section 273a, subdivision (b), which provides in relevant part: "Any person who, . . . having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor." Perez contends that there was insufficient evidence from which the jury could have found that he had "care or custody" of S.F. He also argues that there was insufficient evidence from which the jury could have found that he willfully caused S.F.'s health to be endangered.

When a defendant challenges the sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial

[3] Further statutory references are to the Penal Code unless otherwise indicated.

evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) "Unless it is clearly shown that 'on no hypothesis whatever is there sufficient substantial evidence to support the [jury's] verdict[s,]' we will not reverse. [Citation.]" (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790 [91 Cal.Rptr.2d 888].)

1. *Care or custody*

Perez challenges the sufficiency of the evidence to support the jury's implicit finding that he had the care or custody of at least one child in the house, as required by the first element of the crime of child endangerment under section 273a, subdivision (b). Perez contends that the statute "was enacted to pu[n]ish caretakers, such as parents, guardians, and babysitters who create a risk of harm to a child." Perez acknowledges that courts have upheld convictions based on a finding that the defendant had the care or custody of a child even "when the defendant is not an actual parent," but he insists that those determinations were "based upon a far more substantial relationship than what appeared in this case," and involved "defendants who were more than acquaintances watching a child for a few minutes." He further asserts that the record demonstrates nothing other than that he had "an evanescent presence in the Delgado household." Case law does not support Perez's assertion that this provision applies only to caretakers who are on the level of "parents, guardians, and babysitters." Further, the evidence does not support Perez's factual assertion that his role vis-à-vis the minors who were present at the residence was akin to an "acquaintance[] watching a child for a few minutes."

Perez offers no legal support for his contention that section 273a, subdivision (b) was intended to apply only to "caretakers" whose role vis-à-vis the child is akin to parents, guardians, and babysitters. The language of the statute clearly covers not only parents, guardians, and babysitters, but also individuals who do not necessarily have as substantial a relationship to a child as a parent, guardian, and/or babysitter, but who nevertheless have been entrusted with the care of a child, even for a relatively short period of time.

In most of the cases in which courts have examined the sufficiency of the evidence supporting a conviction under section 273a, or substantially similar statutory provisions, the defendant had a more clearly defined role in the custody or care of the victim than Perez had. (See, e.g., *People v. Cochran*

(1998) 62 Cal.App.4th 826, 832–833 [73 Cal.Rptr.2d 257] (*Cochran*) [child lived in defendant's home at defendant's invitation, and defendant had assumed "parent-like" role]; *People v. Culuko* (2000) 78 Cal.App.4th 307, 335 [92 Cal.Rptr.2d 789] [defendant lived with mother, "took care of the baby," and "at times, [he] was left alone with the baby"]; *Orlina v. Superior Court* (1999) 73 Cal.App.4th 258, 260 [86 Cal.Rptr.2d 384] [defendant was a licensed daycare provider].) However, the fact that the appellate courts in *Cochran, Culuko,* and *Orlina* upheld the convictions of the defendants does not mean that the phrase "having the care or custody of a[] child" (§ 273a) is intended to apply *only* to individuals whose relationship with the victim child is as substantial as the relationship between the defendants and victims in those cases. Like the defendant in *People v. Malfavon* (2002) 102 Cal.App.4th 727, 737 [125 Cal.Rptr.2d 618] (*Malfavon*), Perez "fails to provide any authority to conclude that care or custody may not be established on a *less* substantial relationship" than the relationships in *Cochran, Culuko,* and *Orlina,* and the language of the statute does not suggest care or custody may *not* be premised on a less substantial relationship than that between a parent or guardian and a child.

In *Malfavon,* the court rejected the defendant's argument that his "relationship" to the victim child was insufficient to come within the scope of the child abuse statute because in prior cases the defendants were " 'substantially' more related to the child than he was to [the victim]." (*Malfavon, supra,* 102 Cal.App.4th at p. 736.) Malfavon was the child's mother's boyfriend, but he did not live with the mother and her children. On the occasion at issue in that case, the mother left the child in the car, seated in her car seat while Malfavon was seated in the backseat,[4] as the mother went to "get a few things" from her apartment. (*Malfavon, supra,* 102 Cal.App.4th at p. 731.) Malfavon suddenly appeared at the apartment holding the child, who was spitting up blood. (*Ibid.*) The child eventually died from injuries she suffered as a result of being severely shaken. Malfavon was convicted of violating section 273ab. (*Malfavon, supra,* at pp. 731, 733.)

The court in *Malfavon, supra,* 102 Cal.App.4th 727, determined that there was sufficient evidence that Malfavon "had the care or custody" of the child since Malfavon admitted on cross-examination that he was supposed to be watching the child while the mother went upstairs to her apartment, and the

[4] Malfavon had apparently told the mother that "he was going to get out of the car and smoke a cigarette." (*Malfavon, supra,* 102 Cal.App.4th at p. 731.)

mother testified that she had left the child in his care in the past. (*Id.* at p. 737.) The court determined that there was sufficient evidence to support the jury's finding that Malfavon had the care or custody of the victim, despite the fact that the evidence did not suggest that Malfavon had a substantial caretaking relationship with the child. We similarly reject Perez's assertion that a defendant must have a relationship akin to that of a parent, guardian, or babysitter in order to be found to have had the care or custody of a child for purposes of section 273a and/or similar provisions.

Further, despite Perez's protestations to the contrary, the record provides sufficient evidence to support the jury's finding that Perez had care or custody of S.F. The record demonstrates that Perez was much more than an acquaintance who had only minimal contact with S.F. in the home every now and then, as he suggests. Although the adult family members who testified on Perez's behalf attempted to disclaim any notion that Perez ever babysat for S.F. or cared for her while she was in the home, there was a variety of evidence from which the jury could have concluded that this testimony did not tell the whole story. S.F. herself testified that she called Perez "Daddy Joe," that she ate meals with him, that she spent "a little bit" of time with him, that he was at home "every time [she was] at [her] grandma's house," both "all day long" and "all night long," and that Perez had babysat her "[o]ne day." There was also testimony that Perez did not have a job and that he stayed at the house most of the time. This evidence, combined with evidence that S.F.'s mother worked during the day and that her grandmother slept during the day, permits the reasonable inference that there were times when Perez was the only adult in the house who was not asleep while S.F. was present in the home, and thus, that S.F. was left in his care on such occasions. Despite the lack of direct evidence of any express agreement between S.F.'s main caretakers and Perez that he would take care of S.F., there was substantial evidence that the nature of his relationship with S.F. during her regular visits to the home Perez shared with S.F.'s mother and grandmother created a situation in which Perez was, as a matter of fact, "caring" for S.F. Whether one is "caring" for a child is determined not by agreement, but instead, as a matter of fact based upon the surrounding circumstances.

**(3)** In asserting that there is no substantial evidence to support his conviction on this count, Perez relies predominantly on *Cochran, supra*, 62 Cal.App.4th 826, in which the court stated, "[There is] no special meaning to the terms 'care and custody' beyond the plain meaning of the terms themselves. The terms 'care or custody' do not imply a familial relationship but

only a willingness to assume duties correspondent to the role of a caregiver." (*Id.* at p. 832.) Placing great emphasis on the *Cochran* court's statement that the words " 'care or custody' " imply "only a willingness to assume duties correspondent to the role of a caregiver," (*ibid.*) Perez asserts that there is simply no evidence on this record to support a finding that he was ever willing to assume the duties of a caretaker. Perez's argument is unpersuasive. As we have already discussed, there is evidence from which the jury could have inferred that Perez willingly assumed some duties that correspond to the role of a caregiver. Specifically, S.F. stated that Perez had babysat her, and that she knew him as "Daddy Joe," suggesting some type of caregiving relationship. S.F. also noted that Perez was always in the house, and, indeed, Perez appears to have been the only adult member of the household who did not hold a job outside of the house. Because of this and in view of the work and sleep schedules of the other adults in the house, it was reasonable for jurors to infer both that there were times when Perez was the only adult in the home who was not asleep while four-year-old S.F. was there, and that S.F.'s mother and grandmother would not have left her without any adult supervision. The jury could thus have reasonably concluded that Perez did, at times, assume the role of a caregiver, even if his assumption of those duties was not pursuant to an express agreement among the adults in the home.

The fact that Delgado and Viloria may have been S.F.'s presumptive caregivers does not mean that Perez did not also provide care to S.F. The language of the statute does not suggest that only one person at a time can have the care or custody of a child. It would be illogical to presume that a child who lives in a home with two adults, one of whom has primary child care duties, would not be protected from the actions of the other adult under this statute. The more reasonable reading is that the statute is intended to prevent all adults in such a situation from placing the child in a situation in which the child's welfare is endangered. There was sufficient evidence from which the jury could have concluded that Perez was one of several adults in the home who had the care or custody of S.F., even if the evidence does not suggest that Perez was S.F.'s primary caregiver.

2. *Willful endangerment*

Perez also challenges the sufficiency of the evidence with regard to the element of willfully causing or permitting S.F. to be placed in a situation in which her safety was endangered. He contends that the evidence demonstrates that "the drugs were well-hidden in both a chess set and a plant, not

visible to the naked eye," and that S.F. "had been trained regarding the dangers of syringes," such that there was a "strong inference that even in the very unlikely chance she encountered a syringe, she would have left it alone." He asserts that "[i]n almost any home, a minor child could encounter a variety of bleaches, chemicals, and even poisons that could be harmful if ingested."

Perez relies on *People v. Odom* (1991) 226 Cal.App.3d 1028 [277 Cal.Rptr. 265] and *People v. Toney* (1999) 76 Cal.App.4th 618 [90 Cal.Rptr.2d 578] to support his argument. Perez maintains that his case is distinguishable from these two cases, implying that the evidence in his case is insufficient to establish willful endangerment. In *Odom*, the court upheld defendant's conviction for child endangerment based on evidence that among the things present in the home were dangerous chemicals used in the manufacture of methamphetamine, exposed electrical wire, and 12 weapons, three of which were loaded. (*Odom, supra*, at pp. 1033–1035.) In *Toney*, the court upheld the defendant's conviction based on evidence that the defendant's home contained dangerous and highly flammable chemicals, many of which were on the floor in the living room, dining room, kitchen, and garage, or in a pile of debris in the backyard. (*Toney, supra*, at p. 623.)

Perez contends that in this case, the drugs and syringes were hidden out of sight and that it would be speculative to conclude that S.F. would not have followed her mother's training with regard to the syringes if she had come across them. Perez maintains that the evidence is thus insufficient to support a finding that he willfully endangered S.F. We disagree with Perez's interpretation of the record. It is undisputed that heroin and a syringe full of liquid were located in an unlocked drawer in a two-foot high end table in the entry room of the residence, just inside the front door, and that an uncapped, full syringe was found on top of the end table. All of these things were within a four-year-old child's reach and were accessible to S.F., who had to pass through the entry room to get to her bedroom. Heroin was also found in Perez's bedroom, in plain view, on a dresser that was about four feet tall. S.F. testified that she had gone into Perez's room to see his bird. The jury could have reasonably concluded that leaving drugs and drug paraphernalia in plain view and/or within easy access of a four-year-old child placed that child at unreasonable risk of her personal safety. Further, the jury was free to disbelieve Viloria's testimony that she had educated S.F. regarding the use of syringes, or to draw the reasonable inference that even if Viloria had attempted to educate S.F. regarding syringe safety, it would be difficult for a

child S.F.'s age to apply those rules to a situation that did not involve her mother's syringes, or to overcome a child's natural sense of curiosity.

Perez did not dispute that the drugs and drug paraphernalia belonged to him, or that he had left the items around the home, knowing that there were children in the house. When the evidence is viewed in the light most favorable to the judgment, there is substantial evidence to support the jury's implicit finding that Perez willfully caused or permitted S.F. to be endangered.

B. *The Trial Court Did Not Err in Rejecting Perez's Proposed Instruction*

Perez contends that the trial court erred in rejecting his proposed instruction regarding the meaning of "care or custody." Defense counsel requested that the court give a jury instruction based on language found in *Cochran, supra*, 62 Cal.App.4th at page 832, in addition to the instruction in CALCRIM No. 823,[5] a general instruction on the child endangerment count. Specifically, Perez requested that the court instruct the jury with the following statement: "The terms 'care or custody' do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver." The trial court declined to give the additional instruction, stating: "For purposes of the denial of the defense requested instruction, what I'll note is that in light of the plain language that is in the statute and that is in the current version of the CALCRIM, notwithstanding the prior case law brought to the court's attention, the requested instruction appeared confusing to the court in that it was

[5] The instruction the court gave was as follows:

"The defendant is charged in Count Two with child endangerment.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant, while having care or custody of a child, willfully caused or permitted the child to be placed in a situation where the child's person or health might have been endangered;

"AND

"2. The defendant was criminally negligent when he caused or permitted the child to be endangered.

"Someone commits an act *willfully* when he or she does it willingly or on purpose.

"A *child* is any person under the age of 18 years.

"*Criminal negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when:

"1. He or she acts in a reckless way that creates a high risk of death or great bodily harm;

"AND

"2. A reasonable person would have known that acting in that way would create such a risk.

"In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act."

only a partial reference to the state of the law as I read it, given the earlier discussions that we had on both the *Toney,* T-O-N-E-Y, and *Cochran,* C-O-C-H-R-A-N, cases."

On appeal, Perez contends that the trial court has a duty to go beyond the CALCRIM instructions when necessary, and asserts that the additional instruction was necessary because "the jury was not provided with any guidance regarding the requisite 'willingness to assume duties correspondent to the role of a caretaker' necessary to find appellant guilty."

" ' "[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. . . ." [Citations.] [¶] The rule to be applied in determining whether the meaning of a statute is adequately conveyed by its express terms is well established. When a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that differs from its nonlegal meaning. [Citations.] . . . [T]erms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance. [Citation.]' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 980–981 [86 Cal.Rptr.2d 243, 978 P.2d 1171], italics omitted.)

The words "care or custody" are commonly understood terms that have no particularized meaning. Even the court in *Cochran*, from which Perez obtained the language of the instruction he proposed, concurs in this regard: "[There is] no special meaning to the terms 'care and custody' beyond the plain meaning of the terms themselves." (*Cochran, supra*, 62 Cal.App.4th at p. 832.) Despite the fact that the words "care or custody" need no further elucidation, defense counsel requested an amplifying instruction regarding the meaning of those words.

"[T]he general rule is that a trial court may refuse a proffered instruction if it is an incorrect statement of law, is argumentative, or is duplicative. [Citation.] Instructions should also be refused if they might confuse the jury. [Citation.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224]; see also *People v. Roldan* (2005) 35 Cal.4th 646, 741 [27 Cal.Rptr.3d 360, 110 P.3d 289] [trial court did not err in

refusing to give potentially misleading instruction].) We conclude that the trial court did not err in refusing Perez's proffered instruction regarding "care or custody" because such an instruction could have erroneously implied that the defendant must have affirmatively demonstrated or expressed a willingness to assume caretaker duties, even though there is no such requirement under the statute. The *Cochran* court was attempting to avoid limiting application of the statute to *only* those individuals who were related to the child, as the defendant in that case suggested. The defendant in *Cochran* did not have a familial relationship with the victim, and the *Cochran* court was pointing out that a defendant may still be found to have had the "care or custody" of the child even where no familial relationship exists between them. (See *Cochran, supra*, 62 Cal.App.4th at p. 833.)

In its attempt to avoid limiting the meaning of the terms "care or custody" to a situation in which there is a familial relationship between the caretaker and the child, the *Cochran* court stated, "The terms 'care or custody' . . . imply . . . only a willingness to assume duties correspondent to the role of a caregiver." (*Cochran, supra*, 62 Cal.App.4th at p. 832.) We do not read the court's statement as requiring that a person have undertaken those responsibilities with some affirmative expression of interest in doing so, and without demonstrating reluctance, in order to be found to have had the "care or custody" of a child. Rather, the relevant question in a situation involving an individual who does not otherwise have a duty imposed by law or formalized agreement to care for a child (as in the case of parents or babysitters), is whether the individual in question can be found to have undertaken the attendant responsibilities at all. "Care," as used in the statute, may be evidenced by something less than an express agreement to assume the duties of a caregiver. That a person did undertake caregiving responsibilities may be shown by evidence of that person's conduct and the circumstances of the interaction between the defendant and the child; it need not be established by an affirmative expression of a willingness to do so.[6]

Perez's proposed jury instruction could have erroneously implied that the defendant must have affirmatively demonstrated or expressed a willingness to assume caretaker duties in order to be found to have had the "care or custody" of a child in the house he shared with at least two children. The trial court thus did not err in denying Perez's request for the additional instruction.

[6] Although we do not read *Cochran* to mean that only a person who expresses a willingness to be a caretaker can be determined to have had the "care or custody" of a child under the statute, to the extent that the *Cochran* court's use of the word "willingness" may have been intended to suggest that the statute requires something more than tacit acceptance of the duties correspondent to caretaking, we disagree.

IV.

DISPOSITION

The judgment of the trial court is affirmed.

Benke, Acting P. J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 28, 2008, S166219.