Filed 2/6/24  P. v. Robinson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>ALVIN LEE ROBINSON,<br><br>　　Defendant and Appellant. | G062726<br><br>(Super. Ct. No. RIF087208)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Riverside County, Timothy J. Hollenhorst, Judge.  Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Alan L. Amann and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Alvin Lee Robinson appeals from an order denying his petition for resentencing under Penal Code former section 1170.95 (now § 1172.6).[1] At an evidentiary hearing, the trial court denied the petition, finding beyond a reasonable doubt he was guilty of second degree implied malice murder as an aider and abettor. Robinson seeks reversal on two grounds: (1) Aiding and abetting implied malice murder is not a valid theory of liability; and (2) insufficient evidence showed he acted with implied malice. We reject both grounds and affirm the postjudgment order.

## FACTS

In 1999, Robinson and his wife, Theresa Barroso, became foster parents to eleven-year-old J.M. and four-year-old Andrew Setzer. Two months later, Andrew was dead.

I. *The Morning Andrew Died*

Around 3:00 a.m. on August 2, Barroso and Robinson woke to find Andrew, who had been sleeping in their bedroom, drinking water from a gallon-sized jug. Barroso was upset because Andrew had wet the bed before.

According to Barroso, Robinson asked Andrew, "Why are you drinking this water? You know you are going to pee-pee on yourself," and started yelling at him. As punishment, Barroso forced Andrew to retrieve his "timeout chair" and stand on it. Andrew kept screaming despite Barroso shushing him, so she pushed him and he "flew off his chair." Andrew hit the nightstand and started screaming. Barroso told him to get back on the chair and be quiet. Andrew stood back up, still screaming and crying. Barroso knocked him off the chair again, and he hit against the nightstand a second time. This time, however, Andrew stopped crying and "just kinda like passed out."

---

[1] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.) All further statutory references are to the Penal Code unless otherwise indicated.

According to Robinson, when Barroso saw Andrew drinking water, she pushed him, causing him to fall back and spill the water on the floor. She then grabbed a chair and made Andrew stand on it. Robinson asked her what she was doing and told her that "this is not right." Robinson thought Barroso was going to push Andrew, since she had pushed him when he had the water. Barroso kicked Andrew off the chair only once, causing his head to hit against the nightstand. Robinson denied yelling at Andrew that night.

During this time, J.M. was asleep in his room. He woke up and heard Andrew crying and Robinson yelling, three or four times, "Be quiet!" According to J.M., the crying lasted five to 10 minutes, there was a bang on the wall, and the crying stopped. Thinking everything was okay, J.M. went back to sleep.

Before calling 911, Barroso and Robinson agreed to tell authorities they found Andrew outside the home. To reinforce the story, Barroso took Andrew outside, rolled him in dirt, and brought him back inside. When the paramedics arrived, Barroso told them Andrew had a history of waking in the middle of the night and going outside to play in the yard.

II. *Andrew's Injuries*

Andrew died of subdural hemorrhage from a blunt head injury. There was a bruise on or around his right temple and another near the top of his head; each bruise was about two inches in diameter. Both injuries occurred "close to the same time, if not the same time." But given their locations, it was likely caused by "two separate impacts." According to the forensic pathologist, the amount of force needed to cause these fatal blows was "equivalent to at least a fall from about a 2- to 3-story building landing on the head."

Other injuries could be seen on Andrew's body, some fresh and others at least a few days old. His scrotum was bruised and "extremely swollen." A paramedic who had tended to Andrew estimated his scrotum was "three, four times the size of a

3

normal child, easy." Andrew's penis was also bruised and swollen, and the skin on its tip had been torn. The inner part of his upper thigh had bruising and an abrasion. There were bruises on the back of his left thigh and buttock. Some bruises and abrasions on his chest and abdomen "looked fairly fresh." And he suffered an injury at the back of the abdomen in the midline, which must have been "caused by some blow of some kind directly to the abdomen."

III.     *Andrew's Stay at the Barroso-Robinson Home*

Because Andrew was in such grave condition upon arrival at the hospital, the police interviewed J.M., Barroso, and Robinson that morning. Barroso and Robinson admitted to lying about finding Andrew outside and revealed that Barroso had knocked him off a chair. In October, J.M. and Robinson were interviewed again. Ultimately, the investigation revealed Andrew had suffered physical abuse weeks before his death and that Robinson was either present when it occurred or made aware of it afterwards.

Robinson told police that Andrew got "all the bruises and stuff" from Barroso. About a week after Andrew was placed with them, Andrew began urinating and defecating in his pants or on the bed. Barroso tried many times to "discipline" Andrew. According to Robinson, she made Andrew stand up on a chair and pushed him off it. Robinson also saw her make Andrew stand on the edge of the bed and "push him off backwards," causing Andrew to land on his butt. In his second interview, when asked what would happen if Andrew had landed on his neck, Robinson replied, "He woulda been outta here."

Robinson also told police that Barroso "kicked [Andrew] in the nuts" a total of five times. Once when Robinson pulled down Andrew's pants, he saw Andrew's testicles were swollen and "red pink," "like grapefruit." Robinson told her she couldn't do that. Robinson was going to seek help, but Barroso said if he did anything, her family would "fuck [him] up." In his second interview, when asked if Robinson knew what a "kick in the nuts" could do to a child, Robinson replied, "Probably kill him."

4

Robinson recalled that once at Barroso's workplace, she caught Andrew drinking water out of the faucet, so she returned with a needle and poked Andrew in the arm with it.

Robinson said that he and Barroso sometimes forced Andrew to eat chili peppers and other hot items to get him to eat his meals, which would cause Andrew to cry. Once when Andrew wouldn't eat his dinner, Barroso made him lay stomach-side down on a stool and stretch his limbs out. Other times when Andrew wouldn't finish his food, Barroso gave Andrew a cold shower.

A day or two before Andrew's death, Robinson brought the children to Barroso's workplace. While there, Andrew defecated in his pants. When they arrived home, Barroso took Andrew outside, had him undress, and bathed him with a hose. According to J.M., Barroso hit Andrew with the hose two or three times. Andrew screamed and cried, while Barroso told him to "[s]hut up." J.M. saw Andrew's groin area was "[s]wollen and black."

Later that evening, Andrew urinated on the bed. Barroso "snapped," grabbed Andrew, squeezed his scrotum hard, and "pulled him" towards her. Andrew started crying. She took Andrew to the bathroom and saw blood when he urinated. She called for Robinson to come over. They saw it was purple and swollen.

IV.    *Trial, Verdicts, and Sentencing*

An information charged Barroso and Robinson with murder (count 1; § 187) and assault on a child under the age of eight causing death (count 2, § 273ab). In addition, Barroso was charged with torture (count 3; § 206), and Robinson was charged with felony child endangerment with the infliction of great bodily harm resulting in the child's death (count 4; §§ 273a, subd. (a); 12022.95).

In 2001, Barroso and Robinson were tried together before separate juries. The prosecution's theory at trial was that Barroso tortured and killed Andrew and that Robinson failed to intervene despite his duty to protect Andrew. Robinson's defense

5

painted him as a person with "mild retardation" and who was passive and easily led by others.

Barroso's jury found her guilty on all counts–first degree felony murder (count 1), assault on a child under the age of eight causing death (count 2), and torture (count 3). Robinson's jury found him guilty of second degree murder (count 1), assault of a child under the age of eight causing death (count 2), and felony child endangerment with the infliction of great bodily harm resulting in the child's death (count 4). He was sentenced to 25 years to life on count 2, with concurrent terms of 15 years to life on count 1 and 6 years on count 4.

In the direct appeal, Division Two of the Fourth Appellate District reversed Barroso's murder conviction. As the court explained, Barroso could not be convicted of first degree felony murder based on torture because the crime of torture was not included as a qualifying felony until months after Andrew's killing. The court affirmed Robinson's convictions but stayed execution of sentence for the murder conviction under section 654. (*People v. Barroso* (April 29, 2003, E030240) [nonpub. opn.] (*Barroso*).)

V.    *Section 1172.6 Proceedings*

In 2019, Robinson filed a petition for resentencing under section 1172.6. The trial court issued an order to show cause (OSC) and the parties filed additional briefing. In his OSC brief, Robinson argued that under the current law he could not be convicted of implied malice murder under a theory of direct aiding and abetting. The People's brief argued otherwise and asked the court to take judicial notice of the *Barroso* opinion and the underlying reporter's and clerk's transcripts.

At the OSC hearing,[2] the trial court stated: "When I reviewed the statement of the facts in this case, both in the briefs as well as the Court's reading of the transcripts and the Court of Appeal summary of facts, I found this crime to be unconscionable. I

---

[2]    Robinson chose not to attend the hearing. His counsel informed the court he had been granted parole the day before the hearing.

6

think in my close to 20 years in the criminal justice system, I can't recall a case that was as horrific as this one. With that said, I am prepared to rule as an independent fact-finder." The court found beyond a reasonable doubt Robinson violated his legal duty as a foster parent to protect Andrew from Barroso's daily abuse and acted with conscious disregard for the risk to Andrew's life. In denying the petition, the court stated "such conduct still constitutes aiding and abetting second degree murder with implied malice" and found "Robinson remains guilty of second degree implied malice murder." Robinson timely appealed.

## DISCUSSION

Robinson contends the trial court erred in finding him guilty of direct aiding and abetting implied malice murder because it is no longer a valid theory of murder liability, and in any event, there was no substantial evidence he aided and abetted implied malice murder. We disagree. A defendant may directly aid and abet an implied malice murder. (*People v. Reyes* (2023) 14 Cal.5th 981, 990 (*Reyes*).) And as shown by the trial record, substantial evidence supported the court's finding Robinson acted with implied malice. The court therefore did not err by denying his petition.

I.    *Section 1172.6 and Standard of Review*

"Section 1172.6 allows individuals to petition for relief if they were convicted of murder under theories invalidated by Senate Bill No. 1437. [Citations.] With the enactment of Senate Bill 1437, the Legislature abolished the natural and probable consequences doctrine of murder liability." (*People v. Pittman* (2023) 96 Cal.App.5th 400, 413.) If the petitioner makes a prima facie showing of entitlement to relief, the trial court must issue an OSC and hold an evidentiary hearing to decide whether to vacate the murder conviction, recall the sentence, and resentence the petitioner on any remaining counts. (§ 1172.6, subds. (c) & (d)(1).)

At the hearing, the prosecution has the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as

7

amended by the changes to Section 188 [defining malice]." (§ 1172.6, subd. (d)(3).) The trial "court acts as an independent fact finder in determining whether the People have met their burden." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) To make this determination, the court may consider evidence admitted at any prior hearing or trial that is admissible under current law, or any new or additional evidence submitted by the parties. (§ 1172.6, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*Reyes*, *supra*, 14 Cal.5th at p. 988.) "We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision." (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 97.)

II.     *Aiding and Abetting Implied Malice Murder*

Robinson contends the trial court erred in finding him guilty of second degree murder because direct aiding and abetting an implied malice murder is no longer a valid theory of murder liability. Not so.

Second degree murder is "'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) Malice aforethought is "express or implied." (§ 188, subd. (a).) Malice is implied "when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"" [Citation.] "'To be considered the proximate cause of the victim's death, the defendant's act must have been

8

a substantial factor contributing to the result, rather than insignificant or merely theoretical.'"'" (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

"'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes, supra*, 14 Cal.5th at pp. 990–991.)

"'[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.'" (*Reyes supra*, 14 Cal.5th at p. 990.) In short, "a defendant may directly aid and abet an implied malice murder"—a still valid theory of murder liability. (*Ibid.*)

III.    *Substantial Evidence*

The trial court found Robinson guilty of second degree implied malice murder as an aider and abettor. To find him guilty of that offense, the court was required to find Robinson knew Barroso intended to knock Andrew off the chair (i.e., the act); intended to aid Barroso in performing the act; knew the act was dangerous to Andrew's life; and acted in conscious disregard of Andrew's life. (See *Reyes, supra*, 14 Cal.5th at p. 991.) As we shall explain, these findings are supported by substantial evidence.

9

A.     *Knowledge of Barroso's Intent to Commit Act*

As Robinson acknowledges, "'the actus reus required of the perpetrator is the commission of a life-endangering act.'" (*Reyes, supra*, 14 Cal.5th at p. 991.) That act was Barroso knocking Andrew off the chair. The evidence showed Robinson knew Barroso had previously disciplined Andrew by having him stand on a chair or the edge of the bed and knocking him off. Robinson stated that on the morning of Andrew's death, Barroso grabbed a chair and made Andrew stand on it. This evidence is sufficient for the trial court to find Robinson knew Barroso intended to knock Andrew off the chair.[3]

B.     *Knowledge the Act was Dangerous to Andrew's Life*

"[A] finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard." (*People v. Watson* (1981) 30 Cal.3d 290, 296–297, italics omitted.) At the second police interview, Robinson acknowledged that a "kick in the nuts" could "[p]robably kill" a child, and that if Andrew had landed on his neck, "He woulda been outta here." These statements are sufficient for a fact-finder to infer Robinson understood that Barroso kicking Andrew off the chair was dangerous to his life.

Robinson argues that because of his mental impairment, he was not subjectively aware his failure to intervene would endanger Andrew's life. At trial, a clinical psychologist testified Robinson has an IQ of 66, within the range for mild mental retardation, and functions at the level of the average eight-and-a-half to ten-year-old child. The psychologist explained that someone with Robinson's intellect would have the

---

3       It matters not that Barroso's murder conviction was later reversed. (*Barroso*, *supra*, E030240.) What matters is "the life-endangering *act*, not the result of that act." (*Reyes, supra*, 14 Cal.5th at pp. 990–991.) "Because a direct aider and abettor's guilt 'is determined by the combined acts of all the participants as well as that person's own mens rea' [citation], it is possible for the aider and abettor to be guilty of a more serious offense than the direct perpetrator.'" (*In re Lopez* (2023) 14 Cal.5th 562, 585, fn. 6; *People v. McCoy* (2001) 25 Cal.4th 1111, 1122.)

tendency to agree with people who are questioning him.[4]  At best, this evidence created a conflict concerning his mental state; it did not preclude the court from finding he acted with implied malice.  (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298 [Trial judge must "evaluate and resolve contradictions, and make determinations as to credibility," while "our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt"].)

   C.  *Conduct in Conscious Disregard of Andrew's Life*

    It is undisputed Robinson did not knock Andrew off the chair, the act which proximately caused his death.  It is also undisputed Robinson did not try to intervene. The parties instead dispute whether Robinson's failure to act can qualify as the conduct which aids the direct perpetrator in committing the life-endangering act.  Under the specific facts of this case, we conclude Robinson's inaction so qualifies.

    "'[W]hen an individual's criminal liability is based on the *failure* to act, it is well established that he or she must first be under an existing legal duty to take positive action.'"  (*People v. Rolon* (2008) 160 Cal.App.4th 1206, 1212 (*Rolon*).)  "[T]he failure to perform an act that one has a legal duty to perform is legally equivalent to performance of an act."  (*People v. Werntz* (2023) 90 Cal.App.5th 1093, 1115, review granted, Aug. 9, 2023, S280278.)

    "[A] parent has a duty to protect his or her young child and may be criminally culpable on an aider and abettor theory for an assault causing death and on an implied malice theory for murder where the parent fails to take reasonably necessary steps for the child's protection, so long as the parent, with ability to do so, fails to take those steps with the intent of facilitating the perpetrator's assaultive offense."  (*Rolon*, *supra*, 160 Cal.App.4th at p. 1209.)  Thus, "a parent who knowingly fails to take

---

4   The psychologist acknowledged, however, that his findings would be "faulty" if Robinson had not been honest with him.

11

reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack." (*Id*. at p. 1219.) "[S]uch intentional conduct . . . can support liability for [second degree] murder." (*Ibid*.)

Although Robinson was not Andrew's biological father, Andrew was "placed in the Barroso-Robinson Family foster home." With this placement came the expectation Robinson serve as Andrew's foster parent. Robinson's conviction for felony child endangerment (§ 273a, subd. (a)) supports the conclusion he was duty-bound to protect Andrew. That statute, as relevant here, makes it a crime for a person "having the care or custody of any child[ to] willfully cause[ ] or permit[ ] the person or health of that child to be injured, or [to] willfully cause[ ] or permit[ ] that child to be placed in a situation where his or her person or health is endangered." (§ 273a, subd. (a).)[5] "'The terms "care or custody" do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver.'" (*People v. Toney* (1999) 76 Cal.App.4th 618, 621–622.) Indeed, in the second police interview, Robinson acknowledged that as a foster parent he was responsible for the children.

D.      *Intent to Aid Barroso's Commission of the Act*

"[T]he aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather, relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission

---

[5]      It makes no difference whether Barroso or Robinson was the primary caregiver. "[T]he statute does not suggest that only one person at a time can have the care or custody of a child. It would be illogical to presume that a child who lives in a home with two adults, one of whom has primary child care duties, would not be protected from the actions of the other adult under this statute. The more reasonable reading is that the statute is intended to prevent all adults in such a situation from placing the child in a situation in which the child's welfare is endangered." (*People v. Perez* (2008) 164 Cal.App.4th 1462, 1472.)

12

of that *act* and do so with conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 714.)

Here, there was evidence Robinson intended to help Barroso discipline Andrew. Both Barroso and J.M. reported that Robinson was yelling at Andrew to be quiet. Robinson had a duty to protect Andrew and knew Barroso was going to knock him off the chair. The trial court could reasonably infer that Robinson–by failing to intervene–intended to aid Barroso in knocking Andrew off the chair. (See *Rolon*, *supra*, 160 Cal.App.4th at p. 1219 [fact-finder may reasonably infer mother's intent to aid perpetrator's commission of crime against her child from mother's "presence at the scene of the crime, her duty to protect her child and her failure to do so"].)

In sum, the trial court did not err by finding Robinson guilty of second degree murder and denying the petition.

## DISPOSITION

The postjudgment order is affirmed.

DELANEY, J.

WE CONCUR:

GOETHALS, P. J.

MOTOIKE, J.

13