Filed 1/6/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KEVIN BOM et al., | B292788, B292846, B292914, B292944 |
| Petitioners, | |
| v. | (Los Angeles County Super. Ct. No. BA445260) |
| SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

  Original proceedings; petitions for writ of prohibitions. George G. Lomeli, Judge. Writs granted.

  The Kuyumjian Firm and Hagop Kuyumjian for Petitioner Kevin Bom.

  Shelly Albert for Petitioner Patricia Clement.

  Joseph A. Gutierrez for Petitioner Gregory Merritt.

  Filer Palmer and Lance Filer for Petitioner Stefanie Rodriguez.

  Jackie Lacey, District Attorney, Phyllis Asayama, Deputy District Attorney, and Kenneth Von Helmolt, Deputy District Attorney for Real Party in Interest The People.

No appearance for Respondent Superior Court of Los Angeles County.

_____

Petitioners Kevin Bom, Stefanie Rodriguez, Gregory Merritt, and Patricia Clement were social workers with the Los Angeles County Department of Children and Family Services (DCFS). In 2012 and 2013, petitioners provided emergency and family maintenance services to seven-year-old Gabriel F. (Gabriel), and members of his family. Approximately six weeks after DCFS closed its case, Gabriel died as a result of child neglect and severe head trauma inflicted by his mother Pearl F. (Pearl) and her boyfriend Isauro A. (Tony).

The People charged petitioners with felony child abuse (Pen. Code, § 273a, subd. (a)) and falsifying public records (Gov. Code, § 6200). At a preliminary hearing, the magistrate held them to answer the charges. After the People alleged the same charges by information, the petitioners moved under Penal Code section 995 to dismiss the information. The trial court denied the motions, and petitioners timely filed petitions for a writ of prohibition in this court. (See Pen. Code, § 999a.) We stayed proceedings in the trial court, issued an order to show cause, and consolidated the petitions for purposes of argument and this opinion.

Because the allegations against petitioners under Penal Code section 273a, subdivision (a) are based on their alleged nonfeasance, the People would be required to prove that the petitioners either had the duty and ability to control Gabriel's abusers or had custody or control of Gabriel. We conclude that the petitioners never had the requisite duty to control the abusers and did not have care or custody of Gabriel for purposes of Penal Code section 273a, subdivision (a). We further conclude

2

that the petitioners were not officers within the meaning of Government Code section 6200. There is, therefore, no probable cause to hold them on charges of violating those laws and the trial court should have granted the motions to dismiss. We therefore grant the petitions.

## FACTUAL SUMMARY

Gabriel was born to Pearl in February 2005. From late 2005 until October 2012, Gabriel lived with Pearl's parents. In October 2012, he began living with Pearl, Pearl's boyfriend Tony, and Pearl's two other children, E.F. (age 11 years) and V.F. (age 9 years). Gabriel began attending Summerwind Elementary School that same month.

On October 30, 2012, Gabriel told his teacher, Jennifer Garcia (Garcia), that his mother had hit him on his "bottom" with a belt buckle, causing him to bleed. Garcia noticed a bruise about the size of a half-dollar under Gabriel's left eye and another bruise about the same size on the top of his hand. She called the child protection hotline of DCFS to report potential abuse. Garcia told the hotline screener about the bruises she observed and what Gabriel had told her about being hit by the belt buckle. She said that Gabriel was worried that his mother would hit him because he did not understand his homework. Garcia also told the screener that Gabriel had once pretended to "snort something off of his desk," suggesting that Gabriel was being exposed to illicit drug use.

The DCFS hotline screener prepared referral documents to initiate an investigation of Garcia's allegations. The documents included the information provided by Garcia, as well as reports concerning Pearl from the statewide electronic child welfare system/case management system known as CWS/CMS. These records showed that Pearl had a history of illicit drug use and

3

that the family had been the subject of four prior referrals to DCFS between 2003 and 2011. DCFS determined that each prior referral was "[u]nfounded."

DCFS assigned Gabriel's case to petitioner Rodriguez, a social worker in the emergency response unit in DCFS's Palmdale office. Petitioner Bom was Rodriguez's supervisor.

On October 31, 2012, Rodriguez called Garcia, and Garcia repeated to Rodriguez the information she had given the hotline screener. Rodriguez gave Garcia a telephone number that Garcia could use to contact Rodriguez directly.

Rodriguez contacted Pearl by phone and arranged to visit the family home on November 1, 2012. During that visit, Rodriquez observed that the three-bedroom apartment had functioning utilities and adequate food. She saw no drug paraphernalia in the home. Pearl told Rodriquez she had been a gang member and had a history of cocaine abuse and alcohol abuse, but had been clean for over five years. She said she takes a prescription narcotic for arthritis pain and agreed to drug test. Pearl said that Gabriel's father was in prison and would not be released for six or seven years. Pearl told Rodriquez that she suffered from anxiety and depression and previously received mental health services.

According to Pearl, Gabriel said that his report to Garcia was motivated by his desire to live with his grandmother again. Pearl told Rodriguez that Gabriel claims to hear "little voices" and has aggression issues. She believed that Gabriel may have mimicked snorting cocaine in his classroom because he had watched the film "Blow."

Pearl admitted spanking Gabriel with a belt once, and said she did so because he had been lying and stealing. Rodriguez told Pearl that spanking a child with an object was inappropriate.

4

Rodriguez spoke with Pearl's children and each said that they felt safe in the home and denied any abuse, drug use, or domestic violence in the home. Gabriel denied that Pearl had spanked him with a belt, and his siblings said they had never seen Pearl spank Gabriel with any objects. V.F. reported that her mother spanked her once with a belt. Gabriel said the bruise on his face was caused by bumping the corner of the bathroom door when his mother closed it without realizing he was in the way, and that a scratch on his hand was caused by falling down. He said that his mother helps him with his homework and denied that she makes him stay up all night to finish it. What he told his teacher, he explained, was "a joke."

Rodriguez observed a bruise "approximately the size of a quarter," on Gabriel's buttocks and marked the location of the bruise on a body chart in Gabriel's case file.

On November 2, 2012, Pearl and Tony submitted to drug tests, which came back negative.

On November 20, 2012, Rodriguez made an unannounced visit to the family home. Rodriguez reported she did not see any marks or bruises on the children indicating abuse or neglect. Pearl told Rodriguez that Gabriel had been behaving better since Tony asked a deputy sheriff to let Gabriel sit in the back seat of his patrol car to see what it felt like to be a criminal.

On November 27, 2012, Garcia noticed that chunks of Gabriel's hair were missing, there were four or five bloody scabs on his scalp, a cut on his ear, and he had a bruise the size of a half-dollar under one eye. Gabriel appeared to be sad and embarrassed.

Two days later, Garcia telephoned Rodriguez and reported that Gabriel had a "busted lip" and a "weird" haircut, and had told Garcia that his mother punched him in the mouth. Neither

Garcia nor Rodriquez reported this suspected abuse to the DCFS hotline.

Later that day, Rodriguez visited the family home and observed that Gabriel's hair was cut in a "mohawk" style with chucks of hair missing, and his lower lip appeared to have a scabbing blister. Gabriel told Rodriguez that he bit his lip and cut his own hair in a style to look like a dragon. He said his mother had not spanked or hit him anywhere on his body recently and denied that she punched him in the mouth. Rodriguez did not make any marks on a body chart.

Rodriguez spoke with Gabriel's siblings, who denied any physical abuse. V.F. told Rodriguez that Gabriel injured his lip by falling on the front steps. Rodriquez also spoke with Gabriel's maternal aunt, who was visiting. The aunt reported that when Gabriel was younger, he would smear feces on the wall, get in fights, cut little girls' hair, and "bite the family dog on his private area, and the cats on their ears and paws." Pearl told Rodriquez that she had spanked Gabriel twice recently because he misbehaved, but did not use a belt or other object. Pearl said she was interested in services for Gabriel to address his behavioral issues.

There were no reports or incidents concerning Gabriel during the next four weeks, and, so far as our record reveals, no communication between Pearl or Gabriel and any of the petitioners during that time.

On December 27, 2012, Rodriguez presented the case to a social worker in DCFS's family preservation unit for a possible transfer, or to "be promoted" to that unit. The family preservation unit provides family maintenance services, such as counseling, on a voluntary basis. It is an alternative to juvenile court dependency proceedings.

In connection with the promotion of the case to the family preservation unit, Rodriguez completed and signed a document titled "Investigation Narrative (Investigation/Assessment and Referral Disposition Findings)," which provided a summary of the referral, contacts, and family history concerning Gabriel's case.  (Boldface and underlining omitted.)  The investigation narrative concluded that the allegations of physical abuse were "inconclusive," but added an allegation of "general neglect" based on inappropriate corporal discipline.  (Boldface and underlining omitted.)  Based on DCFS's risk assessment methods, the family was placed in a "very high" risk category.  The document was prepared on or about December 28, 2012, and signed by Bom and Rodriguez on January 30, 2013.

Rodriguez also prepared a case plan and family assessment.  The case plan stated that Pearl's discipline had been "rigid and punitive" "to the detriment of the children," and that her "inappropriate corporal discipline" substantiated "allegations of general neglect."  The case plan reiterated the statement in the investigation narrative that the "allegations of physical abuse are inconclusive."  The plan further stated that the children were "physically healthy," and that Pearl was cooperative, motivated to solve the problems, willing to accept services, and willing to change.  The plan included counseling for Pearl and the children, physical exams for the children as needed, and contact with a social worker twice each month.

On January 16, 2013, Rodriguez visited the family home and saw the children, who reported they were doing well.  Rodriguez did not see any bruises or marks indicative of abuse or neglect and reported that they are "visibly healthy."  Nor did she see any "endangering elements [in the home] that would be cause for immediate concern."  Pearl told Rodriguez that "things had

7

been going well" and there were no recent behavioral issues with Gabriel.

On January 29, 2013, Garcia called Rodriguez and reported that Gabriel had returned to school after a week's absence with swelling under one eye and little bruises on his face. Garcia said that when Gabriel was among other children, he said he had fallen off his bed while playing with his brother. When Garcia spoke with Gabriel alone, however, Gabriel told her that his mother shot him in the face with a BB gun while she made him do exercises.

Rodriguez spoke by telephone with Pearl, who said that Gabriel had fallen off the top bunk bed and suffered some scratches and bruises. Rodriguez visited the family home that afternoon and observed that Gabriel had small bruises and slight swelling on his face. Gabriel told Rodriguez that he had been playing tag with his brother E.F. on the top bunk in the dark when he pulled away and fell face first onto bicycles that were stored next to the bed. Gabriel claimed he gave Garcia the same account and denied telling her that his mother shot him with a BB gun. Gabriel's siblings told Rodriguez that Gabriel had fallen off the bunk bed and onto the bicycles. They also denied that someone had shot anyone with a BB gun.

Pearl told Rodriguez she did not know why Gabriel would say she shot him with a BB gun. Pearl also said that Gabriel had recently approached her, said he was angry, and began hitting himself in the face. Rodriguez discussed the family preservation case plan with Pearl, who then signed it. Rodriguez did not report the new allegations regarding the BB gun to the DCFS hotline, and did not update the body chart for Gabriel to indicate the bruising and swelling on his face.

On January 30, 2013, Rodriquez and Bom signed a case transfer check list, effectively transferring the case to the family

preservation unit. The case was transferred to petitioner Merritt, a supervisor social worker in the family preservation unit, who assigned the case to petitioner Clement, a social worker. Carmen LeNorgant from the Children's Center of Antelope Valley was assigned to provide in-home counseling services.

LeNorgant visited the family home approximately weekly between and including February 8, 2012 and March 6, 2013. Clement accompanied LeNorgant during the February 13, 2013 visit, and completed a family risk assessment that scored the family as having a "high" level risk of abuse—a level between "moderate" and "very high."

LeNorgant found no safety issues for the children in the home on each of her visits. On February 27, 2013, however, Pearl showed LeNorgant a suicide note that Gabriel had written stating, "I love you so much that I will kill my sowf" (*sic*) and "I love you in till you diy" (*sic*). The note included a drawing showing two characters upside down. LeNorgant reported the matter to DCFS and the Los Angeles County Sheriff's Department. Sheriff's deputies visited Gabriel's home, but made no arrests.

During a visit with the family on March 1, 2013, Clement discussed Gabriel's suicide note with Pearl. Clement noted that Gabriel is having "angry and confusing thoughts about his mom and his grandparents," and he "is working with this in counseling."

On March 6, 2013, LeNorgant and Clement visited the home and reported that the children appeared healthy and observed no child safety risks in the home. Clement reported that the children "attend school regularly," a fact the People

9

would later assert was false.[1]  Clement assessed that Pearl was "overwhelmed with her own emotional pain" and "feels that having [family preservation] services is to[o] much for her."  Clement concluded that Pearl is "unwilling to continue counseling" and "is refusing services."  Clement recommended that DCFS "close the case."

In connection with closing the case, Clement prepared a safety assessment and risk assessment concerning Gabriel.  The safety assessment included the following statements, which the People contend are false:  Gabriel "has the cognitive, physical, and emotional capacity to participate in safety interventions"; Pearl "has the cognitive, physical, and emotional capacity to participate in safety interventions"; Pearl has a "willingness to recognize problems and threats placing [Gabriel] in imminent danger"; Pearl has the "ability to access resources to provide necessary safety interventions"; Pearl has "supportive relationships with one or more persons who may be willing to participate in safety planning" and is "willing and able to accept their assistance"; there is "evidence of a healthy relationship between [Pearl] and [Gabriel]"; and Pearl "is aware of and committed to meeting the needs of [Gabriel]."

Clement indicated in the risk assessment that Pearl did not have mental health issues and that she has either demonstrated new skills consistent with case plan objectives or is actively engaged in services to gain such skills.  The risk assessment produced a risk score of six, which correlates to a risk level of "high."  Under DCFS rules, a case with a high risk level cannot be closed unless a supervisor exercises a "discretionary override."

---

[1] The People contend that this statement is false based on evidence that Gabriel was absent from school 37 days out of the 121 days he was enrolled at Summerwind Elementary School.

10

Merritt exercised that discretion and reduced the risk level to "moderate," thereby allowing the case to be closed. The reason Merritt gave for the override was: "Mother's providing [a] safe nurturing home for her children. Mother's boyfriend has developed a caring parental relationship with the children and the children are going to school and receiving counseling."

Barbara Dixon, a therapist intern, conducted therapy sessions with Gabriel in March, April, and May 2013. During a session on March 25, 2013, Gabriel and Pearl disclosed to Dixon that Gabriel had been sexually abused by a relative about three years earlier while he was living with his maternal grandmother. Dixon reported the incident to the DCFS hotline, which prompted a new referral concerning Gabriel. That referral was assigned to social worker Keyana Hadley. According to Hadley, Clement informed her that the new allegations were being addressed in therapy, that there were no present concerns, and that she was preparing to close the family preservation case. It does not appear that Clement or the other petitioners had any further involvement in that referral.

On April 7, 2013, Merritt approved of the safety assessment and of Clement's recommendation to close the case.

In early May 2013, about one month after DCFS closed its case, Garcia telephoned Rodriguez and left voice messages stating that Gabriel had returned to school after a long absence, and he looked "horrible" with a "solid red eye," skin peeling off his forehead, scabs, and marks on his neck. Gabriel told people at school that he was injured riding his bicycle. Rodriguez did not respond to Garcia's messages.

On May 23, 2013, Pearl called 911 and reported that Gabriel had fallen in the bath. Gabriel arrived in the emergency room unresponsive. He had suffered open skull fractures, multiple other fractures, a broken nose, missing teeth, burns,

11

and cuts and bruises on his face and "throughout his body." He also had internal injuries, including a large liver laceration and pulmonary contusions, and swollen lesions throughout his body with embedded metal BB pellets. Medical interventions failed, and Gabriel died the next day. The coroner, Dr. James Ribe, testified that Gabriel had ligature marks on both ankles, marks from being whipped with a cord, and puncture wounds, as well as BB's imbedded in Gabriel's body. Some of his wounds may have been "days to a few weeks" old and others "weeks to months" old. Gabriel had numerous broken ribs, some of which had healed and may have been at least three or four weeks old. Dr. Ribe opined that Gabriel died of blunt force trauma to the head, exacerbated by his weakened condition due to long term injuries, malnutrition, and neglect.

Pearl and Tony were convicted of Gabriel's murder.

## DISCUSSION

### A. *Standard of Review*

Upon a motion to dismiss pursuant to Penal Code section 995, the superior court shall set aside an information if the defendant has "been committed without reasonable or probable cause." (Pen. Code, § 995, subd. (a)(2)(B).) " ' "Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 (*Rideout*).)

On review of an order denying a motion to dismiss, we review the decision of the magistrate that held the defendants to answer. (*People v. Laiwa* (1983) 34 Cal.3d 711, 718.) We will not disturb the order "if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Rideout, supra*, 67 Cal.2d at

12

p. 474.) We may not substitute our "judgment as to the weight of the evidence for that of the magistrate, and, if there is some evidence to support the information, [we] will not inquire into its sufficiency. [Citations.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (*Ibid.*) To the extent the motion to dismiss rests on undisputed facts or the interpretation of statutes, however, our review is de novo. (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141; *People v. Watson* (1981) 30 Cal.3d 290, 300; *People v. Superior Court* (*Ferguson*) (2005) 132 Cal.App.4th 1525, 1529.)

## B.    *Child Abuse Under Penal Code Section 273a, Subdivision (a)*

Penal Code section 273a, subdivision (a) provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

The statute proscribes "four branches," or categories of conduct. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 (*Sargent*).) Each category includes the requirements that the perpetrator's conduct was " 'willful' " and that he or she committed the crime " ' "under circumstances or conditions likely to produce great bodily harm or death." ' " (*Id.* at p. 1216.)[2] The

_____

[2] One acts willfully in this context by acting with criminal negligence. (*People v. Valdez* (2002) 27 Cal.4th 778, 788

13

first two categories apply (1) to persons who cause or permit a child to suffer and (2) to persons who inflict unjustifiable physical pain or mental suffering on a child. (*Sargent*, *supra*, 19 Cal.4th at p. 1216.) The third and fourth categories apply only to persons who committed specified criminal acts or omissions while having the " 'care or custody' " of the child victim. (*Id.* at p. 1227 (conc. opn. of Mosk, J.); *People v. Harris* (1966) 239 Cal.App.2d 393, 398–399; CALJIC No. 9.37; CALCRIM No. 821; cf. *People v. Heitzman* (1994) 9 Cal.4th 189, 197, 204 (*Heitzman*).)

The People do not rely on the second category and, indeed, there is no evidence that any petitioner inflicted any pain or suffering on Gabriel. Nor do they contend that petitioners "cause[d]" Gabriel to suffer within the meaning of the first category. Our review, therefore, is limited to determining whether the petitioners may be criminally liable under (1) the first category—for willfully permitting a child to suffer—or (2) either the third or fourth categories, which require that the petitioners had "care or custody" of Gabriel when the abuse occurred. We examine each in turn.

### 1. *Liability under the first category of Penal Code section 273a, subdivision (a) for permitting a child to suffer*

According to the text of Penal Code section 273a, subdivision (a), liability extends to "[a]ny person who, under circumstances or conditions likely to produce great bodily harm

---

(*Valdez*).) Such " ' "negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences." ' " (*Ibid.*)

or death, willfully . . . permits any child to suffer." In *Heitzman*, *supra*, 9 Cal.4th 189, our Supreme Court considered similar language in Penal Code section 368, which defines crimes of elder abuse.[3] Penal Code section 368 "makes it a felony for any person to willfully permit the infliction of pain or suffering on an elder." (*Heitzman*, *supra*, 9 Cal.4th at p. 200.) The Supreme Court rejected an interpretation of the statute that would impose a duty on everyone "to prevent the infliction of pain and suffering abuse of an elder," because it would render the statutory language unconstitutionally vague. (*Id.* at p. 209.) To avoid having to declare the statute void for that reason, the court construed the language as applying only to persons who (1) "stand in a special relationship to the individual inflicting the abuse on the elder such that the defendant is under an existing duty to supervise and control that individual's conduct," and (2) have "the *ability* to control [the abusive] conduct." (*Id.* at pp. 212–213.) Under this interpretation, criminal liability under the first category for permitting an elder to suffer "is properly based not on the relationship between the defendant and the [abused], but rather, on that between the defendant and the abuser." (*Id.* at p. 213.) By limiting criminal liability in this way, the Supreme Court

---

[3] Section 368, subdivision (b)(1) makes it a crime for "[a] person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is endangered."

acknowledged that "the class of potential offenders may indeed be relatively small." (*Ibid*.)

In discussing the kind of special relationship that may give rise to a duty to control an abuser, the *Heitzman* court cited to *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 (*Tarasoff*), *Megeff v. Doland* (1981) 123 Cal.App.3d 251 (*Megeff*), and section 319 of the Restatement Second of Torts. (*Heitzman*, *supra*, 9 Cal.4th at p. 212.) In *Tarasoff*, the court held that a psychologist had a duty to act to prevent his patient from harming another person when the patient had informed the psychologist of his intent to kill the other person. (*Tarasoff, supra*, 17 Cal.3d at pp. 430–431.) The *Tarasoff* court analogized the duty of the psychologist to that of a doctor who is aware that a patient's condition makes the patient dangerous to others, and that of a hospital, which "must exercise reasonable care to control the behavior of a patient [who] may endanger other persons." (*Id*. at p. 436.)

In *Megeff*, a hospitalized man was moved to the psychiatric ward of a hospital because he had attacked an intern and threatened a nurse. (*Megeff*, *supra*, 123 Cal.App.3d at pp. 257–258.) The man's wife, who allegedly knew that the man had previously assaulted and beat innocent people, obtained the man's release from the hospital after "assuring hospital authorities that [she] would assume full responsibility over him and his conduct and would never leave him unattended." (*Id*. at p. 258.) The wife, however, allowed the man to "roam the streets of Beverly Hills unattended," where he attacked the plaintiff. (*Id*. at pp. 255, 258.) The Court of Appeal indicated that such allegations would be sufficient under *Tarasoff* to establish a duty on the part of the wife to control the attacker. (*Id*. at pp. 257–258.)

16

Lastly, the *Heitzman* court cited to the Restatement Second of Torts for the point that " '[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled' " has a duty to control the third person to prevent such harm. (*Heitzman, supra*, 9 Cal.4th at p. 212, quoting Rest.2d Torts, § 319.) Examples of those who "take[ ] charge" of another for this purpose include the operator of a "hospital for contagious diseases" and a "sanitarium for the insane." (Rest.2d Torts, § 319, com. a, illus. 1 & 2, pp. 129–130.)

In *People v. Flores* (2016) 2 Cal.App.5th 855 (*Flores*), the Court of Appeal applied *Heitzman*'s analysis to Penal Code section 273a to "construe that portion of [Penal Code] section 273a, subdivision (a) that imposes criminal penalties on noncaretakers who 'willfully permit[ ]' the requisite injury to be inflicted on a victim [a]s limited to those persons who had an affirmative duty, under statutory or common law principles, to exert control over the actor who caused or directly inflicted the injury on the victim." (*Flores, supra*, 2 Cal.App.5th at p. 877.) We agree with *Flores* that the reasoning in *Heitzman* compels this construction of the language—"[a]ny person who . . . willfully . . . permits"—in the first category of Penal Code section 273a. (See *Sargent, supra,* 19 Cal.4th at p. 1216, fn. 6 ["Section 368 was patterned on and is virtually identical to section 273a. Cases interpreting one section are therefore appropriately used to interpret the other."].) The threshold question arising under the first category of Penal Code section 273a in this case, therefore, is whether the petitioners had an affirmative duty to exert control over Pearl or Tony. The People assert that the petitioners "arguably" had such a duty. We disagree.

Initially, we observe that the petitioners had no relationship with Pearl or Tony comparable to the types of special

relationships described in *Heitzman* that may "give rise to a duty to prevent an individual from inflicting pain or suffering on" another. (See *Heitzman, supra,* 9 Cal.4th at p. 212.) The petitioners were not Pearl's or Tony's psychologists or physicians (see *ibid.; Tarasoff, supra,* 17 Cal.3d at pp. 436–437); they never assured anyone that they would assume responsibility for Pearl or Tony (see *Megeff, supra,* 123 Cal.App.3d at p. 258); and they never took "charge" of them within the meaning of the cited Restatement provision. (See Rest.2d Torts, § 319.)[4] The People do not refer us to any case that would support the existence of the kind of special relationship between petitioners and Pearl or Tony necessary to support the requisite duty to control them, nor has our research found such a case. Indeed, there is authority suggesting otherwise. (See *DeShaney v. Winnebago Cty. Soc. Servs. Dept.* (1989) 489 U.S. 189, 201-202 [rejecting claim for damages by an abused child against social workers under 42 U.S.C. section 1983 because social workers did not have

---

[4] In 2010, the American Law Institute replaced section 319 of Restatement Second of Torts with Restatement Third of Torts, section 41. (Rest.3d Torts, § 41, com. (a), pp. 64-65.) The drafters expressly incorporated the *Tarasoff* holding, adding the relationship of "a mental-health professional with patients" to the list of special relationships that may give rise to a duty of care to third persons to protect from risks posed by others. (Rest.3d Torts, § 41, subd. (b)(4).) Although the drafters include "social workers" among the "mental-health professionals" that may be subject to such a duty, they limited the duty to social workers "who have a relationship with a mental patient and provide professional psychotherapeutic services to the patient." (Rest.3d, § 41, com. (g), p. 71.) There is nothing in our record to suggest, and the People do not contend, that Pearl or Tony were mental patients or that petitioners provided them with professional psychotherapeutic services.

a special relationship giving rise to a duty of care to protect the child from his abusive father; even though they "may have been aware of the dangers" the child faced, the social workers "played no part in their creation," and they did nothing "to render [the child] more vulnerable to them"]; *Grijalva v. U.S.* (M.D.Ga. 2003) 289 F.Supp.2d 1372, 1379 [social worker did not have a special relationship with patient, who shot his wife, and therefore no duty to protect patient's wife].)

The absence of a special relationship between social workers and a child abuser that would give rise to a duty to control the child abuser is consistent with the rule that police officers ordinarily have no special relationship with individual members of the public and, therefore, "have no legal duty to control the conduct of others." (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 277.) Although police officers "may" arrest a suspect when there is probable cause to believe the suspect has committed a felony (Pen. Code, § 836, subd. (a)), the decision to make the arrest is a matter within the officer's discretion; he or she does not ordinarily owe a *duty* to anyone to do so. (*Michenfelder v. City of Torrance* (1972) 28 Cal.App.3d 202, 206-207; *Tomlinson v. Pierce* (1960) 178 Cal.App.2d 112, 116; *Chavira v. Chavez* (C.D.Cal., Apr. 21, 2014, No. SACV 13-00890 JVS) 2014 WL 12576819 at p. *6.)[5] To

---

[5] An exception to the general rule that police officers may, but are not required to arrest a criminal suspect, applies in domestic violence situations. A police officer is "require[d]" to arrest "an offender, absent exigent circumstances, if there is probable cause that a protective order . . . has been violated." (Pen. Code, § 13701, subd. (b); see also Pen. Code, § 836, subd. (c)(1).) Peace officers are also required to arrest one who has been charged with a crime. (Pen. Code, § 142, subd. (a).) These situations are not relevant here.

19

the extent a social worker could be viewed as having the ability to control a suspected child abuser at all—such as by taking the child into protective custody or initiating dependency proceedings—that ability is similarly discretionary. (See Welf. & Inst. Code, § 306, subd. (a) [social worker "may" take child into temporary protective custody when exigent circumstances exist]; *Jacqueline T. v. Alameda County Child Protective Services* (2007) 155 Cal.App.4th 456, 466 [social workers' actions relating to investigations of child abuse, removal of child from parents, and initiating dependency proceedings are discretionary]; *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 881 [same].) Thus, just as "[c]ourts have refused to find a special relationship or impose liability based on the negligence by police personnel in responding to requests for assistance, in conducting or failing to conduct an investigation, in failing to warn of a potential danger or in failing to provide sufficient protection where the police have not induced reliance on a specific promise that they would provide specific protection" (*M.B. v. City of San Diego* (1991) 233 Cal.App.3d 699, 705, fns. omitted), social workers likewise have no such special relationship with the suspected wrongdoer or duty to control them.

The People do not cite to any statute or case law to support an argument that petitioners had the duty to control Pearl or Tony. The only authority they cite on this point is language in a DCFS procedural guide that "[t]he interventions in the safety plan are designed to control the risk factors posing a safety threat to the child." (Italics omitted.) Among possible "interventions" is the removal of the child from the family home. The People argue that this language authorized the petitioners to remove Gabriel from his home and thereby restrict and control Pearl's and Tony's access to Gabriel. By statute, any such removal is permitted only "if the information [the social workers] possess at the time of seizure

provides reasonable cause to believe that the child is in imminent danger." (*M.L. v. Superior Court* (2009) 172 Cal.App.4th 520, 527; see *Wallis v. Spencer* (9th Cir. 2000) 202 F.3d 1126, 1138 [same]; see also *In re Henry V.* (2004) 119 Cal.App.4th 522, 525 [removing children from parents under existing law is a "last resort"].) Even if there were facts suggesting the petitioners in this case had such information at the relevant time, they were merely *permitted* to take such action; they were not required to do so. (Welf. & Inst. Code, § 306, subd. (a) [social worker "may" take child into protective custody].) Thus, neither the DCFS procedural guide cited by the People nor the statutes upon which it is derived create the necessary "existing duty" to take custody. (*Heitzman*, *supra*, 9 Cal.4th at p. 212.) Moreover, imposing criminal liability on a social worker for making discretionary decisions, when the best solution is not always obvious, would create an incentive for the social worker to focus more on his or her own liability rather than on the best interest of the child.

In the absence of a legal duty to control Gabriel's abusers, petitioners cannot be held to answer for the crime of willfully permitting a child to suffer under the first category of Penal Code section 273a, subdivision (a). (See *Heitzman*, *supra*, 9 Cal.4th at p. 215 [criminal charges must be dismissed in absence of evidence tending to show that defendant had a legal duty to control the conduct of the victim's abusers].)

### 2. *Care and custody under Penal Code section 273a*

Under the third and fourth categories of Penal Code section 273a, subdivision (a), the defendant must have committed the alleged criminal acts or omissions while "having the care or custody of any child." Thus, in contrast with the first category of crimes under the statute, which was focused on the relationship between the defendant and the abuser, the third and fourth

21

categories are focused on the relationship between the defendant and the victim.

The People do not contend that any of the petitioners ever had legal or physical custody of Gabriel; indeed, it appears to be undisputed that at all relevant times, Gabriel's mother and/or her live-in companion, Tony, held legal and/or physical custody of Gabriel. For the petitioners to be criminally liable, therefore, they must have had "the care" of Gabriel when they committed the acts or omissions that allegedly "cause[d] or permit[ted]" Gabriel "to be placed in a situation where his or her person or health [was] endangered." (Pen. Code, § 273a, subd. (a).)

Our Supreme Court has not stated what it means to have the care of a child for purposes of Penal Code section 273a, although it has used the word "caretaker" as a synonym for the phrase in the analogous elder abuse statute. (See *Heitzman*, *supra*, 9 Cal.4th at pp. 197, 213 [discussing care or custody of an elder for purposes of elder abuse under Penal Code section 368]; see also *In re Ethan C.* (2012) 54 Cal.4th 610, 620, fn. 5 [referring to Penal Code section 273a as applying to "child's caretaker's or custodian's willful placement of child in situation dangerous to child's health or person"].)

Courts of Appeal have used the terms "caretaker" and "caregiver" interchangeably to refer to one who has the care of a child for purposes of Penal Code section 273a (see, e.g., *Flores*, *supra*, 2 Cal.App.5th at pp. 880–882), and have stated that having " 'care or custody' [of a child does] not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver." (*People v. Cochran* (1998) 62 Cal.App.4th 826, 832 (*Cochran*); accord, *People v. Morales* (2008) 168 Cal.App.4th 1075, 1083; *People v. Perez* (2008) 164 Cal.App.4th 1462, 1472 (*Perez*); *People v. Culuko* (2000) 78 Cal.App.4th 307, 335 (*Culuko*); *People v. Toney* (1999)

76 Cal.App.4th 618, 621–622 (*Toney*).)  That role, one court held, need not be "evidenced by . . . an express agreement to assume the duties of a caregiver" (*Perez, supra,* 164 Cal.App.4th at p. 1476); evidence of a defendant's "conduct and the circumstances of the interaction between the defendant and the child" may establish that the defendant "did undertake caregiving responsibilities."  (*Ibid.*)

Persons convicted under the care or custody prongs of Penal Code section 273a are typically parents of the child victims.  (*Heitzman, supra,* 9 Cal.4th at p. 205, fn. 14; see, e.g., *Valdez, supra,* 27 Cal.4th at p. 781; *Sargent, supra,* 19 Cal.4th at pp. 1210–1211.)  Courts of Appeal have, however, upheld convictions of persons who were not parents of the abused child when they assumed a role as his or her caretaker or caregiver.  In *Cochran, supra,* 62 Cal.App.4th 826, for example, the defendant invited the mother of the child and the child into his residence and acted "as the child's surrogate father in that he watched and fed the baby, gave her baths and helped put her down for naps."  (*Id.* at pp. 829, 833.)  In *Culuko, supra,* 78 Cal.App.4th 307, the defendant lived with the mother of the infant victim and the infant in one room, and there was evidence that the defendant "took care of the baby" and "at times, . . . was left alone with the baby."  (*Id.* at p. 335.)  The defendant also "bathed the baby, changed the baby, and gave the baby a bottle at 2:30 a.m.," shortly before the baby died.  (*Ibid.*)  "[M]ost significantly, [there was evidence that] five days before [the baby] died, [the defendant] said he was taking full responsibility for caring for the baby so the baby would bond with him."  (*Ibid.*; see also *Toney, supra,* 76 Cal.App.4th at p. 622 [defendant married the mother of the six-year-old victim, invited both into his home, and gave the child "a room of his own and allowed him to use an area in the living room"]; *People v. Malfavon* (2002)

23

102 Cal.App.4th 727, 737 [Defendant was the boyfriend of infant's mother and had the "responsibility for watching [the child]" when the injuries occurred; the mother had previously left the child in defendant's care; and the defendant "had babysat" the child "when she [previously] suffered injuries."].)

Here, there is no evidence that any of the petitioners in this case had a role in Gabriel's life similar to the roles the defendants had in cases where the defendant had the care required for liability under Penal Code section 273a. None of the petitioners ever lived with Gabriel; none fed, bathed, or babysat him; none had physical custody of Gabriel at any time; none were present with him while his caregivers were away or slept; and none provided food or clothing to Gabriel, or otherwise assumed a role as his caretaker or caregiver. The People have not referred us to any case in which a social worker was found to have care or custody of a child for purposes of Penal Code section 273a, and our research has revealed none.

The only case the People cite in support of the care or custody element is *Perez*, *supra*, 164 Cal.App.4th 1462. That case, however, is distinguished on its facts. In *Perez*, the defendant lived in his sister's home along with his sister's daughter, grandson and, two days per month, four-year-old granddaughter. (*Id.* at p. 1466.) On other days, the granddaughter lived with her father in Tijuana, Mexico. (*Ibid.*) The defendant had care of the granddaughter based on evidence that: Whenever the granddaughter was present, the defendant, who was unemployed, "stayed at the house most of the time" (*id.* at p. 1471); there were times when defendant "was the only adult in the house who was not asleep while [the granddaughter] was present in the home, and thus, . . . [the granddaughter] was left in [defendant's] care on such occasions" (*ibid.*); the defendant "babysat" the granddaughter on one occasion (*ibid.*); and the

24

granddaughter called defendant " 'Daddy Joe,' " "ate meals with him," and "spent 'a little bit' of time with him." (*Ibid*.)  The Court of Appeal explained that, although the defendant's sister and her daughter were the victim's "presumptive caregivers," the defendant "was one of several adults in the home who had the care or custody of [the granddaughter]." (*Id.* at p. 1472.)  Here, by contrast, there is no indicia of the caregiving acts that supported the care or custody finding in *Perez*.

The People's theory regarding the care or custody element appears to be that the petitioners had the requisite caregiver status by virtue of various Welfare and Institutions Code statutes and social services manuals and guides.  As a threshold matter, the theory is based on an implied and unsupported argument that Penal Code section 273a applies not only to those who *have* "the care or custody of any child" but also to those who *have a duty to undertake* the care or custody of the child.  The text of the statute, however, does not support this theory:  It explicitly applies to those who, in fact, have the "care or custody" of the child; the additional words the People would graft onto the statute—or one who has a duty to undertake the care or custody of the child—are not in the statute and we may not rewrite the statute to add them.  (See *Metromedia, Inc. v. City of San Diego* (1982) 32 Cal.3d 180, 187; *Seaboard Acceptance Corp. v. Shay* (1931) 214 Cal. 361, 365–366.)

Even if Penal Code section 273a was ambiguous and reasonably susceptible to the People's interpretation, adopting that interpretation would be contrary to the rule of lenity:  "[W]hen a statute defining a crime or punishment is susceptible of two reasonable interpretations, the appellate court should ordinarily adopt that interpretation more favorable to the defendant." (*People v. Avery* (2002) 27 Cal.4th 49, 57.)  This rule " ' "ensures that criminal statutes will provide fair warning

25

concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." ' " (*Ibid.*)  If we assume that the statute is reasonably susceptible to the People's interpretation, this rule compels rejection of that interpretation here because the petitioners, having not assumed any caregiver or custodial role in Gabriel's life, did not have fair warning that their conduct exposed them to criminal liability, particularly in light of existing case law, discussed above, which does not suggest such liability for social workers.

Moreover, the statutes the People rely upon—Welfare and Institutions Code sections 16500, 16501, subdivision (c), 16504, and 16506—do not support a duty by the social workers to act as caretakers or caregivers for purposes of Penal Code section 273a.

Welfare and Institutions Code section 16500 provides: "The Legislature hereby declares its intent, in providing for this statewide system of child welfare services, that all children are entitled to be safe and free from abuse and neglect." (Welf. & Inst. Code, § 16500.)  Welfare and Institutions Code section 16501, subdivision (c) mandates that "[t]he county shall provide child welfare services as needed pursuant to an approved service plan and in accordance with regulations promulgated, in consultation with the counties, by the department." (*Id.*, § 16501, subd. (c).)  These statutes state only a general legislative intent and an obligation by "the county" to provide welfare services as stated.  They cannot reasonably be construed as imposing a duty on individual social workers to act as a caregiver or caretaker for purposes of Penal Code section 273a.

Welfare and Institutions Code section 16504, subdivision (a) provides:  "Each county child welfare services department shall maintain and operate a 24-hour response

26

system.  An immediate in-person response shall be made by a county child welfare services department social worker in emergency situations in accordance with regulations of the department.  The person making any initial response to a request for child welfare services shall consider providing appropriate social services to maintain the child safely in his or her own home." (*Ibid*.)  Under this section, a social worker must respond to emergency situations and "consider providing appropriate social services to maintain the child safely in his or her own home." (*Ibid*.)  The act of considering whether to provide appropriate social services cannot reasonably be compared with the kinds of acts—such as residing with, feeding, bathing—that courts have associated with the role of a caregiver.  Thus, even if "having the care" of a child could be construed to include having the duty to care for the child, that duty is not created merely by the statutory requirement that social workers respond to emergencies and consider whether to provide services.

The People also rely on Welfare and Institutions Code section 16504, subdivision (b).[6]  That subdivision, however, applies only when a social worker receives a referral

---

[6] Welfare and Institutions Code section 16504, subdivision (b) provides:  "A county child welfare services department social worker shall make an in-person response whenever a referral is received pursuant to [Welfare and Institutions Code] Section 11254.  Whenever a referral is received pursuant to [Welfare and Institutions Code] Section 11254, the county child welfare services department social worker, within 20 calendar days from the receipt of the referral, shall determine whether the physical or emotional health or safety of the individual or child would be jeopardized if the individual and child lived in the same residence with the individual's own parent or legal guardian, or other adult relative."

"pursuant to [Welfare and Institutions Code] Section 11254." (Welf. & Inst. Code, § 16504, subd. (b).) Section 11254 of the Welfare and Institutions Code applies only "in the case of any individual who is under the age of 18 years and has never married, and who is pregnant or has a dependent child in his or her care." (Welf. & Inst. Code, § 11254 subd. (a).) That situation did not occur here and, therefore, neither section 11254 nor section 16504, subdivision (b) apply. Even if it did, subdivision (b) merely imposes upon social workers the duty to "determine" whether the "physical or emotional health or safety" of the unmarried minor and child who are the subjects of a referral would be jeopardized if they "lived in the same residence with the individual's own parent or legal guardian, or other adult relative." (Welf. & Inst. Code, § 16504, subd. (b).) It neither constitutes "having the care" of a child for purposes of Penal Code section 273a, nor imposes a duty of such care.

The People's reliance on Welfare and Institutions Code section 16506, subdivision (b) is similarly misplaced. That statute provides that the "county child welfare department staff" shall provide or arrange for family maintenance services for "[f]amilies whose child is in potential danger of abuse, neglect, or exploitation, who are willing to accept services and participate in corrective efforts, and where it is safe for the child to remain in the child's home only with the provision of services." (Welf. & Inst. Code, § 16506, subd. (b).) Providing or arranging for family maintenance services is not akin to "having the care" of the child, as courts have construed that phrase; and a duty to provide or arrange such services is not equivalent to a duty to act as a caretaker or caregiver.

The People also rely on a provision of the California Department of Social Services Child Welfare Services manual of

policies and procedures, which states:  "The social worker initially investigating a referral shall determine the potential for or the existence of any condition(s) which places the child, or any other child in the family or household, at risk and in need of services and which would cause the child to be a person described by Welfare and Institutions Code Sections 300[, subdivisions] (a) through (j)."  The duty to make the determination required by the manual does not make one a caretaker or impose a duty to act as one.

Lastly, the People point to a provision in the DCFS procedural guide which provides that a social worker "may detain a child without a court order if the [social worker] determines that a child is described by Welfare and Institutions Code [section] 300, [subdivisions] (b) or (g) and is in immediate danger of suffering serious physical injury and there is no less intrusive means of protecting the child."  This provision mirrors Welfare and Institutions Code section 306, subdivision (a)(2), which, as discussed in part B.1, is permissive, not mandatory, and does not require a social worker to take a child into protective custody.

In sum, the statutes the People rely on create duties on the part of the county to provide child welfare services (Welf. & Inst. Code, § 16501, subd. (c)), and on the part of social workers to respond immediately in person in emergency situations (*id.*, § 16504, subd. (a)), to consider providing appropriate services (*ibid.*), and to provide or arrange for family maintenance services in particular situations (*id.*, § 16506, subd. (b)).  The existence of these duties, by themselves or collectively, do not constitute "having the care or custody" of a child within the meaning of Penal Code section 273a, subdivision (a); and, assuming the rule of lenity does not apply, the statutes do not create a duty to have such care or custody.  Although there may be consequences to

29

social workers who fail to fulfill these duties, the consequences do not include criminal liability for child abuse under Penal Code section 273a.

### C. *Government Code Section 6200*

The People allege that the petitioners violated Government Code section 6200 because each "was an officer having custody of a record, map, book, paper and court proceeding, filed and deposited in a public office, and placed in the defendant's hands and, as to the whole and part thereof, did steal, remove, secrete, destroy, mutilate, deface, alter and falsify said document."[7] More particularly, the People assert that the petitioners committed this crime because they "either made knowingly false entries, or permitted knowingly false entries to be made or maintained in the DCFS . . . electronic systems."

Clement and Merritt contend that they were not "officer[s]" within the meaning of Government Code section 6200. We agree.

Government Code section 6200 does not define the term, "officer." Courts have construed the term to mean one who holds a position " ' "created by the Constitution or authorized by some statute" ' " and who is " ' "clothed with a part of the sovereignty of the state to be exercised in the interest of the public." ' " (*Bennett v. Superior Court* (1955) 131 Cal.App.2d 841, 844 (*Bennett*);

---

[7] Government Code section 6200 provides: "Every officer having the custody of any record, map, or book, or of any paper or proceeding of any court, filed or deposited in any public office, or placed in his or her hands for any purpose, is punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for two, three, or four years if, as to the whole or any part of the record, map, book, paper, or proceeding, the officer willfully does or permits any other person to do any of the following: [¶] (a) Steal, remove, or secrete. [¶] (b) Destroy, mutilate, or deface. [¶] (c) Alter or falsify." (Gov. Code, § 6200.)

accord, *Kirk v. Flournoy* (1974) 36 Cal.App.3d 553, 557.) As our Supreme Court explained in another context, "where the [L]egislature creates the position, prescribes the duties, and fixes the compensation, and these duties pertain to the public and are continuing and permanent, not occasional or temporary, such position or employment is an office and he who occupies it is an officer. In such a case, there is an unmistakable declaration by the [L]egislature that some portion, great or small, of the sovereign functions of government are to be exercised for the benefit of the public, and the [L]egislature has decided for itself that the employment is of sufficient dignity and importance to be deemed to be an office." (*Patton v. Board of Health etc.* (1899) 127 Cal. 388, 398.)

The California Constitution establishes three county officers—sheriff, the district attorney, and assessor—and the Legislature has enacted a list specifying "[t]he officers of a county." (Cal. Const., art. XI, § 1, subd. (b); Gov. Code, § 24000.) The Legislature has further provided that "deputies" of an officer are deemed "officer[s]" for purposes of laws that confer power or impose liability on an officer. (Gov. Code, § 24100.) Courts have relied on these statutes in concluding that the statutorily enumerated county officers and their deputies are officers for purposes of Government Code section 6200. (See, e.g., *People v. Pearson* (1952) 111 Cal.App.2d 9, 17 (*Pearson*).) Thus, because a sheriff is a statutorily enumerated county officer (Gov. Code, § 24000, subd. (b)), a deputy sheriff was deemed an officer for purposes of Government Code section 6200 in *Pearson, supra,* 111 Cal.App.2d at page 17. Similarly, a county treasurer is an enumerated officer (Gov. Code, § 24000, subd. (f)), and an employee of the treasurer with the authority to negotiate payment plans with delinquent account holders was deemed an

31

officer for purposes of Government Code section 6200 in *People v. Varon* (1987) 189 Cal.App.3d 1163, 1167.

Charter counties, such as Los Angeles County, are constitutionally authorized to specify different or additional county officers. (Cal. Const., art. XI, § 4, subds. (c) & (e).) Los Angeles County has done so, and has specified numerous elected and appointed "officers." (L.A. County Charter, art. IV, § 14.)[8] For purposes of determining whether one is an officer within the meaning of Government Code section 6200, there is no reason to treat Los Angeles County's enumeration of officers differently from the treatment courts have given to the Legislature's enumeration of county officers; that is, one who is identified as an officer in the Los Angeles County Charter is, like one who is identified as a county officer in the Government Code, an officer for purposes of Government Code section 6200.

The petitioners are employees of DCFS, a department created by Los Angeles County ordinance and headed by its "Director." (L.A. County Code, §§ 2.38.010, 2.38.020; L.A. County

_____

[8] The Los Angeles County's elected officers are: The members of the Board of Supervisors (L.A. County Charter, art. II, § 4) and the "Sheriff, District Attorney, and Assessor" (*id.*, art. IV, § 12). The appointive officers of Los Angeles County are: Auditor, Members of the Board of Education, Members of the Board of Law Library Trustees, Members of the Civil Service Commission, Coroner, County Clerk, County Counsel, Fish and Game Warden, Health Officer, Horticultural Commissioner, License Collector, Livestock Inspector, Members of the Probation Committee, Probation Officer, Public Administrator, Public Defender, Purchasing Agent, Recorder, Registrar of Voters, Road Commissioner, Superintendent of Schools, Surveyor, Tax Collector, Treasurer, Director of Hospitals, Director of Public Social Services, Director of Adoptions, and Director of Personnel. (*Id.*, art. IV, § 14.)

32

Ord. Nos. 84-0125, § 2, 94-0101, § 1.)  Neither the Constitution nor the Legislature created the positions, prescribed the duties, or fixed the compensation of the director of DCFS or its employees; they are employed by and act on behalf of the county, and are not " ' "clothed with a part of the sovereignty of the state." ' " (*Bennett, supra*, 131 Cal.App.2d at p. 844; see *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 255 [" 'states are sovereign but cities and counties are not' "].)  Nor are their positions within either the Government Code's enumeration of county officers or Los Angeles County's list of officers in its charter.  Therefore, under any test for determining whether one is an officer for purposes of Government Code section 6200, petitioners were not officers.  (Cf. *Cleland v. Superior Court* (1942) 52 Cal.App.2d 530, 537 [superintendent of county hospital was not an officer because the position was not established as an office by the Legislature or the county].)[9]

---

[9] Our dissenting colleague relies on Welfare and Institutions Code section 215, which provides that "the term 'probation officer' shall include . . . any social worker in a county welfare department . . . when supervising dependent children of the juvenile court pursuant to [Welfare and Institutions Code] Section 272 by order of the court under [Welfare and Institutions Code] Section 300."  Even when social workers have the responsibilities of probation officers for the purposes identified in Welfare and Institutions Code section 215, however, that statute did not transform the defendants into deputies of the probation officer for purposes of Government Code sections 6200 and 24100; they remained employees of DCFS, a county "department," not an "office," that is headed by a "director," not an "officer."  (Compare L.A. County Charter, §§ 12, 14 [establishing county officers] with L.A. County Code, §§ 2.38.010, 2.38.020, 2.38.040 [establishing DCFS as a county department].)

33

Before the trial court, the People argued that the petitioners are officers because (1) they are employed as social workers and supervising social workers; (2) they held college level degrees; and (3) they received training relevant to their positions. The People did not explain how these facts support the assertion that the petitioners are officers, and they offered no citation to authority to support the contention. Although the magistrate, by holding petitioners to answer the charge, implicitly decided that there was some evidence that petitioners were officers, neither the magistrate nor the trial court expressly addressed the issue.

In response to the petitions filed in this court, the People argue that petitioners are officers because they were appointed by the DCFS director, their salaries are fixed by ordinance, and they come within the definition of a "professional" worker under the Los Angeles County Code. (See L.A. County Code, § 5.04.030, subd. (Q).) The People offer no evidence or authority to support a finding that the director of DCFS is an officer, or explain why we should not rely on the county's enumeration of officers in its charter. Because the DCFS director is not an officer, the subordinates the director appoints are not officers, even if the county classifies them as "professional" employees and sets their salaries.

The People also point out that neither Bom nor Rodriguez raised the argument that they are not officers; only Merritt and Clement asserted it. We may, however, decide the issue for all parties because the pertinent facts are undisputed, the issue is purely legal, and there is no basis for applying the law differently among the petitioners. (See *Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811 [court may decide case on issue not raised "under fair procedure in an appropriate case"].) The People, who have opposed the argument asserted by Merritt and Clement, do not suggest that they were deprived of the

34

opportunity to make some other or additional argument that would apply to Bom or Rodriguez.  To hold, as the People suggest, that the counts of violating Government Code section 6200 should be maintained as to two petitioners because they did not raise the point, even though the counts are dismissed as to the other two petitioners, would merely put the former petitioners to the task of raising this point after remand, at which time this opinion would supply the law of the case compelling the dismissal of the counts against them.  We decline to require such a waste of time and judicial resources, and therefore apply the law to each petitioner.

Because the petitioners are not officers within the meaning of Government Code section 6200 as a matter of law, the charges of violating that statute must be dismissed.[10]

---

[10] Because we conclude that the information shall be dismissed, we do not reach any other argument asserted by petitioners.

## DISPOSITION

Let a peremptory writ of prohibition issue directing respondent superior court to vacate its order denying petitioners' motions to dismiss the information, and to issue a new order granting the motion and setting aside the information. Upon this decision becoming final, our prior order to stay proceedings below is lifted.

<u>CERTIFIED FOR PUBLICATION</u>.


ROTHSCHILD, P. J.

I concur.


WEINGART, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CHANEY, J., Concurring and Dissenting


### A.     Penal Code Section 273a

I agree that *People v. Heitzman* (1994) 9 Cal.4th 189
(*Heitzman*) precludes petitioners' prosecution under Penal Code
section 273a.  However, I view the application of *Heitzman* here
as falling squarely within the category of unintended
consequences Justice Baxter identified in his *Heitzman* dissent.

The People have alleged facts that, if proven, would suffice
to show that Rodriguez, Bom, Clement, and Merritt did not
merely permit Gabriel's mother and her boyfriend to murder
Gabriel, they enabled it.  By abdicating their responsibilities and
falsifying documents, these social workers prevented the system
from working and prevented anyone else from rescuing Gabriel.

Gabriel's first-grade teacher, Jennifer Garcia, began calling
DCFS about Gabriel in October 2012.  When she initially called,
Garcia called DCFS's Child Protection Hotline.  Petitioner
Rodriguez (supervised by petitioner Bom) was assigned as the
primary social worker on Gabriel's case.  According to Garcia,
Rodriguez told Garcia to call her directly in the future—
bypassing the Child Protection Hotline—because it was an open
case.  "After my initial call to the hot line number," Garcia
testified, "once I received contact by [petitioner] Rodriguez telling
me to call her, I was under the impression that calling her was
reporting at that time . . . .  [¶] . . . [¶] . . . She said call me.
Contact me.  Let me know what is going on.  It's an open case.  So
I did."

From her very first contact with Gabriel, Rodriguez omitted
injuries from the body chart she created to document Gabriel's
injuries.  On December 28, 2012, Rodriguez added and

substantiated a general neglect allegation to Gabriel's case, even though the allegations were of physical abuse. And although a variety of Gabriel's injuries had been reported to her and observed by her, in an effort to move Gabriel's file to DCFS's Family Preservation unit—a move that could not happen if social workers concluded Gabriel could not safely remain in his home— Rodriguez classified Garcia's October physical abuse report as inconclusive. Bom approved the documents Rodriguez manufactured to have Gabriel's case transferred. And in spite of even more allegations of physical abuse the day before the case was to be transferred to the Family Preservation unit, Bom still approved the transfer.

Gabriel's case was transferred to the Family Preservation unit on January 31, 2013. Rodriguez never told Garcia that the case had been transferred, so Garcia continued making phone calls to Rodriguez that went unreturned.

The Family Preservation unit supervisor, petitioner Merritt, assigned Gabriel's case to petitioner Clement on January 31, 2013. The People have alleged that Clement's documentation is replete with significant misrepresentations. The cumulative effect of Clement's false statements (that Merritt reviewed and approved) is that in spite of continued and relentless torture and abuse, DCFS identified no threat to Gabriel's safety and was thus free to close his case; "an accurate assessment," the People allege, "would have prevented the case from being closed under DCFS policy."

The People allege that Rodriguez, Bom, Clement, and Merritt did not violate the statute merely by *failing to act*, but rather *by acting* in a way that heightened the risk to Gabriel and prevented others from helping. California cases have found a

2

duty under similar circumstances in different contexts: "courts have found a special relationship giving rise to an affirmative duty to act where some act or omission on the part of the defendant either created or increased the risk of injury . . . or created a dependency relationship inducing reliance or preventing assistance from others. [Citations.] Where, however, the defendant took no affirmative action which contributed to, increased, or changed the risk which would otherwise have existed, and did not voluntarily assume any responsibility to protect the person or induce a false sense of security, courts have refused to find a special relationship giving rise to a duty to act." (*People v. Oliver* (1989) 210 Cal.App.3d 138, 147.)

*Heitzman*'s analysis of Penal Code section 368, subdivision (a), which is virtually identical to Penal Code section 273a, further limits the extent to which a duty may arise by limiting liability under Penal Code section 273a to only those who have the ability to control the ultimate abuser. Justice Baxter's *Heitzman* dissent explained that the opinion must have been focused on bystander liability. Justice Baxter explained that he believed the "special relationship" test the *Heitzman* Court fashioned "dishonor[ed]" the statute's "clear intent." (*Heitzman, supra*, 9 Cal.4th at p. 216 (dis. opn. of Baxter, J.).) Justice Baxter wrote that the "statute applies to 'any person' who commits the misconduct described therein. The quoted phrase is specific, unambiguous, and subject to no construction 'other than a literal one.' " (*Id.* at p. 217 (dis. opn. of Baxter, J.).) I agree with Justice Baxter.

It is accurate that these social workers did not have "the ability to control" the conduct of Gabriel's mother and her boyfriend. I agree, therefore, that because of *Heitzman,*

3

Rodriguez, Bom, Clement, and Merritt may not be prosecuted under Penal Code section 273a.

### B.    Government Code Section 6200

I would conclude that petitioners Rodriguez, Bom, Clement, and Merritt are "officers" within the meaning of Government Code section 6200 and may be prosecuted under that statute.

In 1857, the Supreme Court defined officers as "all persons in any public station or employment conferred by government" and concluded that one was a public officer where he was "appointed by government; the duties which he is to perform concern the public, and he is paid out of the public treasury . . . ." (*Vaughn v. English* (1857) 8 Cal. 39, 42.)  In 1921, the Supreme Court spoke at length:  "A public officer is a public agent and as such acts only on behalf of his principal, the public, whose sanction is generally considered as necessary to give the act performed by the officer the authority and power of a public act or law.  The most general characteristic of a public officer, which distinguishes him from a mere employee, is that a public duty is delegated and intrusted to him, as agent, the performance of which is an exercise of a part of the governmental functions of the particular political unit for which he, as agent, is acting.  There are other incidents which ordinarily distinguish a public officer, such, for instance, as a fixed tenure of position, the exaction of a public oath of office, and, perhaps, an official bond, the liability to be called to account as a public offender for misfeasance or nonfeasance in office and the payment of his salary from the general county treasurer.  [Citations.]  [¶]  . . . As a matter of course, in keeping with these definitions, a *county* officer is a *public* officer, and may be specifically defined to be one who fills a position usually provided for in the organization of counties and

4

county governments and is selected by the political subdivision of the state called the 'county' to represent that governmental unit, continuously and as part of the regular and permanent administration of public power, in carrying out certain acts with the performance of which it is charged in behalf of the public." (*Coulter v. Pool* (1921) 187 Cal. 181, 187.)

By 1978, California courts had distilled "public officer" down to two necessary components: "first, a tenure of office which is not transient, occasional, or incidental but is of such nature that the office itself is an entity in which incumbents succeed one another and which does not cease to exist with the termination of incumbency and, second, the delegation to the officer of some portion of the sovereign functions of government either legislative, executive, or judicial." (*City Council v. McKinley* (1978) 80 Cal.App.3d 204, 210.)

DCFS's social workers are public officers by any of those measures. One division of this court has analogized DCFS's social workers to criminal prosecutors: "Although child services workers do not initiate criminal proceedings, their responsibility for bringing dependency proceedings, and their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor. The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children." (*Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 880.)

The history of DCFS and the Los Angeles County Charter also support the conclusion that DCFS's social workers are public officers. The Los Angeles County Charter, like the Government

5

Code, has an enumerated list of county officers.  Although the Government Code list does not contain a "Director of Hospitals" or a "Director of Public Social Services," the County Charter *does* list both of those "officers."  (Compare Gov. Code, § 24000, subds. (a)-(y) with L.A. County Charter, art. IV, § 14.)  Presumably, then, "Director of Hospitals" or "Director of Public Social Services" can be included in the Government Code's enumeration as one of "[s]uch other officers as are provided by law."  (Gov. Code, § 24000, subd. (y).)  The County Charter contains a similar provision:  "Such other officers as may hereafter be provided by law shall also be appointive."  (L.A. County Charter, art. IV, § 14.)

In fact, the County Charter enumerates as one of its "officers" a "Director of Adoptions."  (L.A. County Charter, art. IV, §§ 14, 22 ½.)  When the County amended its charter to create DCFS, though, it moved all responsibility of the "Director of Adoptions" to the Director of DCFS:  "Administration of all adoption activities:  To direct adoption casework activities, such as matching children with adoptive parents, coordinating interagency placement of children, securing court orders declaring children abandoned, and recruitment of foster and adoptive homes, including, but not limited to, all activities and functions of the former *department of adoptions* set forth in repealed County Code Chapter 2.38."  (L.A. County Code, § 2.38.040(F).)[11]

---

[11] I do not find the designation of DCFS as a "department" under the Los Angeles County Code meaningful in this context. The Los Angeles County Code defines a "subordinate officer" as "an officer subordinate to and acting under the direction of the

6

These social workers are public officers under any of the various court-created definitions of the term.  They are also public officers under the statutes that enumerate public offices of Los Angeles County and the County Code section creating and empowering the Director of DCFS to perform the duties of a specifically-enumerated public office.  And they are also public officers according to the Legislature's designation of social workers as probation officers in the context of the performance of their DCFS duties.  (See Gov. Code, § 24000, subd. (x); Welf. & Inst. Code, § 215.)

Welfare and Institutions Code section 215 states "[a]s used in this chapter, unless otherwise specifically provided, the term

---

*department* head and his assistant officer or assistant officers." (L.A. County Code, § 2.02.240, italics added.)  Nor do I find the creation of DCFS as part of Title 2, Division 3 of the Los Angeles County Code any more persuasive.  The "Board of Supervisors" is also created and described as part of Title 2, Division 3, governing county "departments and other administrative bodies," yet it would seem impossible to argue that the Supervisors are not public officers.  (L.A. County Code, § 2.36.010 et seq.)  Chapter 2.52 of the Los Angeles County Code creates and describes the Treasurer-Tax Collector, Chapter 2.77 creates and describes the Department of Public Health, Chapter 2.84 creates and describes the County Law Library, and Chapter 2.102 creates and describes the Department of Public Social Services, and *all of those* are in Title 2, Division 3 of the Los Angeles County Code.  The Los Angeles County Charter lists the Treasurer, Tax Collector, Health Officer, Members of the Board of Law Library Trustees, and the Director of Public Social Services on its enumerated list of county officers, which includes "[s]uch other officers as may hereafter be provided by law."  (L.A. County Charter, art. IV, § 14.)

'probation officer' or 'social worker' shall include the juvenile probation officer or the person who is both the juvenile probation officer and the adult probation officer, *any social worker in a county welfare department . . . .*"  The Los Angeles County Code further provides:  "Employees of the [DCFS] . . . shall perform all activities necessary to provide protective services to juveniles.  Designated department employees providing services to juveniles shall be deemed to be social workers in a county welfare department, pursuant to Welfare and Institutions Code Sections 215 . . . ."  (L.A. County Code, § 2.38.050.)

I am most disturbed by the negative incentives this case creates for social workers and for DCFS.  Allowing a social worker to evade liability for falsifying a public document would incentivize social workers to put their own interests in avoiding liability for their misdeeds above the purpose of the state's child welfare statutory scheme, which is child safety.  The petitioners' actions here prevented the system from working in whatever way it might have had they done their jobs honestly, and offers no incentive for either DCFS or individual social workers to work to reform and repair the parts of the system that may fail the children it is intended to protect.  We have, in effect, encouraged DCFS and its social workers to cover their tracks if they stumble on the cracks in the system.

\* \* \*

Although I agree that the petitioners may not be prosecuted under Penal Code section 273a, I would find that they may be prosecuted as public officers under Government Code section 6200.

CHANEY, J.

8