Filed 6/23/21  In re S.S. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re S.S. et al., Persons Coming Under the Juvenile Court Law. | B309447 |
| | (Los Angeles County Super. Ct. No. 19CCJP07386A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. VERONICA O., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Steff R. Padilla, Juvenile Court Referee. Reversed.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Veronica O., mother of now four-year-old S.S. and two-year-old G.S., appeals from the juvenile court's jurisdiction findings and disposition order removing the children from her care and placing them under the supervision of the Los Angeles County Department of Children and Family Services. Veronica argues that substantial evidence did not support the court's jurisdiction findings under Welfare and Institutions Code section 300, subdivision (b),[1] and that we must therefore reverse them along with the disposition order. We agree and do.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *The Department Files a Section 300 Petition, and the Juvenile Court Holds a Detention Hearing*

On November 13, 2019, as part of a narcotics investigation, Detective Yanez of the Los Angeles County Sheriff's Department was surveilling a motel when he saw Sesar Uribe exit one of the rooms with "a white paper bag" in his hand, get into a parked car, and drive away. Detective Yanez had a warrant to search Uribe,

_____

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

and he contacted other sheriff's deputies with instructions to pull Uribe over.  They did so, and when Detective Yanez arrived on the scene, one of the deputies showed him "a white plastic bag" containing "a large quantity" of methamphetamine Uribe had tossed from the car before he was pulled over.  Detective Yanez questioned Uribe, who stated that he had spent the past two nights in the room at the motel, that he had no drugs or weapons there, and that the deputies were welcome to search the room. The deputies arrested Uribe, who later admitted he had been selling methamphetamine for the previous 10 months.

On returning to the motel room, the deputies encountered Veronica, S.S., and G.S.  Asked if she was staying in the room, Veronica answered, "Yes, me and my kids stayed here last night with my friend Sesar because I had nowhere to go."  Asked if there were any illegal drugs or weapons in the room, she said, "I don't know."  The deputies found no drugs or weapons in the room, but they did learn Veronica had an outstanding arrest warrant, issued in September 2016, for absconding from probation after a conviction for identity theft.  The deputies arrested Veronica, took the children into protective custody, and transported all three to the station.

A Department social worker, Ava Vivar, met the deputies at the station and interviewed Veronica.  Veronica told Vivar that she and her children were currently homeless and that the children's father, Gilbert S., was incarcerated in Oregon.  She said that she and the children had previously lived with Gilbert's mother, Lucy S., but that they had moved out because Veronica "wanted to move on with her life."  Veronica stated that Uribe was a longtime friend, that they had no romantic relationship, and that, aware of her "living situation," he allowed her and the

3

children to stay one night with him at the motel.  She denied any prior knowledge of the drugs the deputies recovered from Uribe and stated that she did not see any drugs or drug paraphernalia in the motel room and that she and the children had never ridden in Uribe's car.  Veronica said she had last used drugs "a long time ago" and agreed to contact the Department for drug testing on her release from custody.  Vivar informed Veronica the Department intended to detain S.S. and G.S. because no parent was available to care for them.

Vivar also interviewed Uribe.  He stated that he and Veronica had been friends for more than 10 years, that they did not have a romantic relationship, and that, running into her the day before his arrest and learning she and her children were homeless, he let them sleep in his motel room for one night.  It was no inconvenience to him, he explained, "as he was hardly ever in his room."  He insisted that Veronica did not know about the methamphetamine in his possession and that he kept them in his car and did not bring them into the room.  He admitted he had smoked methamphetamine for the last four years, including the day before his arrest, but denied smoking it in the motel room or around S.S. and G.S.

Having detained S.S. and G.S. and placed them with Lucy, the Department filed a petition under section 300, subdivision (b)(1), alleging in a single count (b-1) that Veronica "created a detrimental and endangering home environment for the children in that [she] allowed . . . Uribe, who is a Registered Controlled Substance Offender and a current user of methamphetamine, to reside in the children's home and to have unlimited access to the children."  In its detention report the Department stated that Gilbert was incarcerated in Oregon in

4

connection with, among other crimes, possessing and delivering methamphetamine and that his earliest release date was December 8, 2021.

The detention report also stated the Department had received a referral concerning Veronica when she gave birth to G.S. in February 2019. The referral source expressed concerns because Veronica had admitted a history of methamphetamine use and tested positive for methamphetamine during a prenatal examination in September 2018. G.S., however, "tested negative for all drugs," and Veronica "tested negative for all substances" nine days after G.S. was born, at which time Veronica stated she "had been sober for five to six years." The Department concluded at that time there was no evidence to support intervention.

The detention report also included statements from an interview with Lucy. Lucy stated that Veronica had lived with her for three years before moving out in March 2019. She stated that Veronica said she was moving in with a friend whose mother had Alzheimer's, to work as the mother's caretaker, but also that Veronica moved out because she "did not like all of [Lucy's] rules." Veronica later told Lucy that the arrangement with the friend did not work out and that Veronica was now homeless, but that she was receiving motel vouchers from a church and expected to receive additional housing assistance. Veronica also told Lucy that Veronica's social worker suggested Veronica "'find someone in a similar situation to share a room'" with and that, by following that advice, she and the children spent the night with Uribe in the motel.

Lucy also reported that, although Veronica no longer lived with her, Veronica visited her "on a daily basis" and S.S. "always ate in her home." Lucy denied ever seeing Veronica under the

influence of drugs or in possession of drugs or drug paraphernalia. Lucy did state "she had concerns about possible drug use" by Veronica, and when asked why, she said Veronica smoked cigarettes and she (Lucy) believed "cigarettes were gateways to drugs." Lucy stated that she had no "concerns regarding neglect of the children by [Veronica]" and that Veronica "simply . . . needed to be more organized with the children."

At the detention hearing in November 2019, counsel for Veronica stated that, "when [Veronica] is released, she does want to be drug testing for the Department." The juvenile court found the Department made a prima facie case the children were persons described by section 300 and ordered their continued detention. The court also ordered "parenting referrals, drug and alcohol counseling, and testing referrals." The court asked Veronica, "What's your rap sheet look like?" Veronica mentioned the warrant for identity theft and then said, "I think it was driving without owner's consent. It was a long time ago 2013 or 2011—something like that." The court ordered, "Drug and alcohol testing—counseling and testing." The minute order from the hearing stated: "Mother to receive referrals for parenting, drug testing and counseling."

B.  *The Department Files an Amended Petition and a Jurisdiction and Disposition Report*

In January 2020 the Department filed an amended petition, adding two new counts under section 300, subdivision (b)(1). Count b-2 alleged Veronica "has a history of use of illicit substances, that includes a history of arrests for controlled substances, and having had positive test for

6

methamphetamines when pregnant with [G.S.]  In addition, [Veronica] has a recurrent close affiliation with people who abuse methamphetamines that has included [Gilbert], and most recently with unrelated male friend, Sesar Uribe.  [Veronica] has placed the children at risk of harm in that the police arrested Sesar Uribe at the children's home on 11/13/19, during which Mr. Uribe was admitted to having used methamphetamines the night prior to his arrest and methamphetamine[ ] was found in his vehicle parked outside the motel residence where [Veronica] and the children were staying with Mr. Uribe."  Count b-3 alleged Gilbert "has a history of substance abuse, and is a recent user of the methamphetamines.  [He] recently suffered a drug relapse and is presently serving a prison sentence for drug-related offences."

The Department also filed a jurisdiction and disposition report stating that Veronica and Gilbert remained incarcerated, but that Veronica expected to be released in February 2020.  The Department reported Veronica was arrested four times in 2013 on drug-related charges: in May 2013 for possessing a controlled substance, possessing a controlled substance while armed, and being under the influence of a controlled substance; in September 2013 for possessing a controlled substance and bringing a controlled substance into a prison; in December 2013 for possessing a controlled substance for sale, though she was released on that occasion for lack of evidence; and again in December 2013 for possessing controlled substance paraphernalia.  In August 2015 a warrant for Veronica was issued in connection with, among other things, pending drug-related charges.  In December 2015 she was arrested on the warrant and for, among other things, possessing a controlled

7

substance for sale.[2]  The Department reported Gilbert had a number of (undated) convictions for drug-related offenses.

The Department also reported that in a January 2020 interview, referring to her decision to move out of Lucy's home in March 2019, Veronica stated "she realizes she made poor choices by choosing to leave and later choosing to not return to [Lucy's] residence where she said was always available to her and safe for the children, given she had limited means."  Veronica also suggested the referral indicating she tested positive for methamphetamine while pregnant with G.S. was "inaccurate."

The Department also interviewed Gilbert in January 2020. He stated Veronica "told him of the people she had started to hang out with following his recent incarceration, and said he tried to dissuade her from keeping company with such people because of the drug related activities."  He also said that he asked Veronica whether she was using drugs and that she answered no. He said that he had never known Veronica to use methamphetamine, but that she "used to drink alcohol excessively" before having S.S. and G.S.  Gilbert's expected release date of December 8, 2021 remained unchanged.

C.    *The Juvenile Court Sustains the Petition and Removes the Children*

In January 2020 the juvenile court held a jurisdiction hearing, which it continued, ultimately, to March 10, 2020.  In the meantime, Veronica was released from custody (on

---

[2]    It is unclear from the record how the drug-related charges against Veronica were resolved.

February 6, 2020).[3]  At the hearing the court sustained the petition, finding count b-2 true as alleged, finding count b-3 true after striking the allegation that Gilbert "recently suffered a drug relapse," and dismissing count b-1.

Regarding count b-2, the court stated:  "Mother was . . . arrested that day for a no-bail warrant for identity theft.  Mother has an extensive history of arrests and convictions for theft and, as I indicated, an arrest warrant for failure to appear on identity theft as well as controlled substances.  She then—[Gilbert], who is the presumed father of the children is—was engaged in narcotics offenses which is why he is in prison, and then she expects—well, the court finds by a preponderance of the evidence that she is now with a second gentleman who has been arrested for drugs.  There's way too much drugs around these children.  And therefore the court finds b-2 is found to be true by a preponderance of the evidence.  Mother's around drugs.  She makes her children [*sic*] around drugs, and she's around people who have drugs.  That is a risk.  They don't have to actually ingest it.  The court's concerned about the lack of judgment."  At the conclusion of the hearing, the court asked Veronica, "Are you testing?"  Veronica answered, "Yes."  The court responded, "Good.  Let's see those results."

After a number of continuances because of the COVID-19 pandemic, the court held a disposition hearing on October 30, 2020.  In the meantime, the Department filed several last minute information reports, which stated Veronica had "not provided the

---

[3]  The Department reported Veronica "declined to utilize the referral provided to her by [the Department] and by a local church," choosing instead to sleep in her car.

Department with any letters of enrollment for any Court ordered program," was a "No Show" for drug tests on July 8, July 24, September 30, and October 6, 2020,[4] and maintained "she was not going to drug test as the Court had not ordered her to do so."

At the disposition hearing the Department and counsel for the children asked the court to remove the children. Counsel for Veronica asked the court to place the children with Veronica on the condition she comply with the case plan and live in Lucy's home. Counsel for Veronica addressed the Department's report that Veronica was not participating in services: "I would note that [Veronica] has not been ordered to do any services. She was not ordered to drug test. So I disagree with the [Department] that she is noncompliant, as she is not currently in violation of any court orders . . . . " Counsel added that Veronica "understands on this court date the court can order her to participate in services." The court declared the children dependents of the court and removed them from Veronica and Gilbert. Veronica timely appealed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

"Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or

---

[4]     The Department reported that one of its social workers spoke with Veronica on July 1, 2020 and "placed [her] on random drug testing on this date[ ] and sent [her] a follow-up email with drug testing information."

10

inability of his or her parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse.' [Citation.] A jurisdictional finding under section 300, subdivision (b)(1), requires [the Department] to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; see *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.)

"In deciding whether there is a substantial risk of serious physical harm, within the meaning of section 300, subdivision (b), courts evaluate the risk that is present at the time of the adjudication hearing. 'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.'" (*In re Roger S.* (2018) 31 Cal.App.5th 572, 582; *In re J.N.* (2021) 62 Cal.App.5th 767, 775 [child protective agency "must establish a nexus between the parent's past conduct and the current risk of harm"].)

"In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings . . . , we 'consider the entire record to determine whether substantial evidence supports the juvenile court's findings.' [Citations.] 'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.'" (*In re L.W.*, *supra*, 32 Cal.App.5th at p. 848.) In reviewing for substantial evidence, "a reviewing court should 'not reweigh the

11

evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings . . . ." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

B.    *Substantial Evidence Did Not Support the Jurisdiction Finding Relating to Veronica*

Veronica contends the juvenile court erred in finding her conduct caused the children to suffer, or to be at substantial risk of suffering, serious physical harm, as alleged in count b-2. She argues that there is no substantial evidence she placed the children at risk of physical harm by staying with them for one night in the motel room with Uribe and that, even if there were, there is no substantial evidence any such risk remained at the time of the jurisdiction hearing.[5] We agree with her, at a minimum, on the latter point.

The parties wrangle over the "white paper bag" Deputy Yanez observed in Uribe's hand as Uribe left the motel room on November 13, 2019. The Department argues the juvenile court could reasonably infer that it was the same "white plastic bag" full of methamphetamine the sheriff's deputies later recovered from Uribe and that Veronica had allowed her children to stay the night in a motel room where Uribe "possessed and used methamphetamine." The Department argues "[i]t is well settled that allowing children to be in proximity to drugs and drug paraphernalia places them at substantial risk of serious physical harm," and for that proposition it cites (only) *People v. Perez*

---

[5]    The Department has never contended the children suffered actual physical harm or illness as a result of Veronica's conduct.

12

(2008) 164 Cal.App.4th 1462 (*Perez*). Veronica argues that Deputy Yanez deliberately distinguished the "paper" bag Uribe left the motel room with from the "plastic" bag of drugs the deputies later recovered, that all the other evidence showed Uribe kept the drugs in his car and did not take them into the motel room or near the children, and that there was no evidence Uribe used drugs inside the motel room or in the presence of the children.

There are two problems with the Department's argument. First, the court's holding in *Perez*, *supra*, 164 Cal.App.4th 1462 was not as broad as the Department advertises. In that case, where a defendant was convicted of willfully endangering the health of a child (Pen. Code, § 273a, subd. (b)), the court found there was substantial evidence to support "the element of willfully causing or permitting [the child] to be placed in a situation in which her safety was endangered." (*Perez*, at p. 1472.) Citing undisputed evidence that heroin and liquid-filled syringes lay on various two-foot-high and four-feet-high surfaces in a house where a four-year-old regularly visited, the court found "the jury could have reasonably concluded that leaving drugs and drug paraphernalia in plain view and/or within easy access of a four-year-old child placed that child at unreasonable risk of her personal safety." (*Id.* at p. 1473.) The circumstances here were distinguishable: Even assuming Uribe took a bag of drugs into the motel room for some period on the night in question, there is no evidence G.S. and S.S., who were nine months old and two years old, respectively, at the time, could easily access the drugs or were otherwise physically endangered by their "proximity."

Second, even assuming Veronica placed the children at substantial risk of physical harm by allowing them to stay one

13

night in a motel room with Uribe and his drugs, there is no evidence any such risk remained at the time of the jurisdiction hearing. Nothing in the record suggests that Veronica had ever previously shared a motel room or other "residence" with Uribe, that she ever would again, or that Veronica, Gilbert, or anyone else ever kept drugs in the children's proximity. The Department does not even argue there was any such evidence.

In fact, the Department's argument here is essentially that, at the time of the jurisdiction hearing, the children were at substantial risk of physical harm because of what the Department variously describes as Veronica's "long-standing association with illegal drugs," "associating with people known to be involved with drugs," and "longstanding and ongoing association with illegal drugs and people who used and sold them." But an ill-advised "association" is not, without more, a basis for juvenile court jurisdiction. The Department "'has the burden of showing specifically how the minor[ ] ha[s] been or will be harmed'" (*In re J.N.*, *supra*, 62 Cal.App.5th at p. 775), which requires showing "an actual nexus" between the parent's conduct "and any specifically identified, substantial, current risk of serious physical harm" (*ibid.*) to the child. Repetitious incantations of Veronica's "association" with illegal drugs do not satisfy that requirement. (See *id.* at p. 776 ["although we acknowledge that, on an abstract level, violent crime is incompatible with child safety, [the Department] cannot use such generalities to satisfy its burden of proving an *'identified, specific hazard* in the child's environment' that poses a substantial risk of serious physical harm to him"].)

Finally, the Department suggests Veronica's positive drug test while pregnant with G.S., coupled with her subsequent

14

denial of the accuracy of that test result, constitutes substantial evidence to support the true finding on count b-2. But that evidence does not support the true finding on count b-2 because nothing in count b-2, or anywhere else in the amended petition, alleged any risk of harm to the children as a result of Veronica's drug use. Nor did the Department make that argument at the jurisdiction hearing. "'"[N]otice of the allegations upon which the deprivation of custody is predicated is fundamental to due process. [Citations.] Accordingly, a parent must be given notice of the specific factual allegations against him or her with sufficient particularity to permit him or her to properly meet the charge."'" (*In re S. O.* (2002) 103 Cal.App.4th 453, 460; see *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1036-1037.)

C.     *Substantial Evidence Did Not Support the Jurisdiction Finding Relating to Gilbert*

We also agree with Veronica that the juvenile court erred in sustaining the petition based on Gilbert's conduct as alleged in count b-3. The Department does not attempt to identify any actual nexus between Gilbert's conduct and a specifically identified, substantial, current risk of physical harm to the children. The Department argues only that Gilbert's "criminal history demonstrates his serious, unresolved decades-long problem with illegal drugs" and that a "parent's substance abuse is prima facie evidence of substantial risk to children of tender years who require adequate supervision," a proposition for which it cites *In re Drake M.* (2012) 211 Cal.App.4th 754 (*Drake M.*). But that argument is unpersuasive.

The court in *Drake M.* explained that "'[c]ases finding a substantial physical danger tend to fall into two factual patterns.

One group involves an *identified, specific hazard* in the child's environment—typically an adult with a proven record of abusiveness.  [Citations.]  The second group involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety.  [Citations.]'  [Citation.]  And we also hold that, in cases involving the second group, the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm."  (*Drake M.*, *supra*, 211 Cal.App.4th at pp. 766-767; see *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219 ["because the children were six years old or younger at the time of the jurisdiction hearing—children of 'tender years' in the language of [*In re Rocco M.* (1991) 1 Cal.App.4th 814]—'the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm'"].)

The presumption the Department invokes from the holding in *Drake M.* applies, then, when the juvenile court has made a "finding of substance abuse."  (*Drake M.*, *supra*, 211 Cal.App.4th at p. 767; see *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1385; *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219.)  But the juvenile court here did not make a finding of current substance abuse by Gilbert and, in sustaining count b-3, even struck the allegation Gilbert had "recently suffered a drug relapse."  (Cf. *In re Christopher R.*, at pp. 1214, 1219 [applying the presumption where the juvenile court found that the mother of children less than six years old was "a current abuser of cocaine" whose "substance abuse endangers" the children].)  Thus, the presumption does not apply.

16

And even if it did, it was rebutted by the absence of any evidence Gilbert ever cared for or supervised the children while under the influence of drugs. (See *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 728 [rejecting the argument that, "when a parent engages in substance abuse, dependency court jurisdiction is proper"]; cf. *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219 [mother "did not adequately rebut" the juvenile court's substance abuse finding, where "her use of cocaine during the last months of her pregnancy confirmed her poor judgment and willingness to endanger her children's safety due to substance abuse"].) Indeed, the Department cites no evidence he ever cared for or supervised them when sober. Of course, from at least some point in 2018, when Gilbert was arrested and incarcerated in Oregon, until at least December 8, 2021, the date of his expected release, he could not and cannot.[6]

---

[6] Because we are reversing the jurisdiction findings, we also reverse the disposition orders. (See *In re Roger S.*, *supra*, 31 Cal.App.5th at p. 583 ["Because there was no basis for dependency jurisdiction, we also reverse the disposition order and the custody order the juvenile court issued."].)

17

## DISPOSITION

The juvenile court's jurisdiction findings and disposition order are reversed.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.